**PACIFIC COAST MEDICAL ENTER-PRISES, a California Corporation, Plaintiff-Appellant and Cross-Appellee,**

v.

**Patricia HARRIS,\* Secretary of the United States Department of Health, Education and Welfare; et al., Defendants-Appellees and Cross-Appellants.**

**Department of Benefit Payments of the State of California, Amicus Curiae.**

Nos. 77–2914, 77–3281.

United States Court of Appeals, Ninth Circuit.

March 28, 1980.

Rehearing Denied June 23, 1980.

against Gipson should she file a new claim for SSA disability benefits.

\* We substitute the name Patricia Harris, the successor to the original appellee and cross-appellant Joseph A. Califano, as the Secretary of the United States Department of Health, Education and Welfare, per Fed.R.App.P. 43.

pellee; Memel, Jacobs, Pierno & Gersh, Los Angeles, Cal., argued.

Arthur R. Chenen, Los Angeles, Cal., for Pacific Coast Medical.

Henry Eigles, Baltimore, Md., for H. E. W.

Before GOODWIN and TANG, Circuit Judges, and EAST,[**] District Judge.

EAST, District Judge:

Pacific Coast Medical Enterprises (PCME), a California corporation and provider of Medicare services,[1] petitioned the District Court to review a final decision of the Secretary of Health, Education and Welfare denying reimbursement for certain amounts claimed by PCME to be compensable under Medicare. PCME had acquired the assets of a corporate Medicare provider by first purchasing 100 percent of the capital stock of that provider and shortly thereafter liquidating that corporation. The Secretary ruled, for purposes of recognizing a stepped-up basis in computing reimbursements, that this two-step transaction was not a purchase of assets under the Medicare regulations. The District Court reversed the Secretary's decision. The Court's order enjoined the Secretary from withholding Medicare reimbursements from PCME for not only the year under review, but all subsequent cost-reporting years as well, and directed the method for computation of goodwill. *Pacific Coast Medical Enterprises v. Califano*, 440 F.Supp. 296 (C.D.Cal. 1977).

The Secretary appeals.[2] We note jurisdiction under 28 U.S.C. § 1291. We believe

Sherwin L. Memel, Los Angeles, Cal., on brief, for plaintiff-appellant and cross-ap-

[**] Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. An entity is an authorized Medicare provider by virtue of a contract, called an 1866 agreement, between it and the Secretary. Such contracts arise under § 1866 of the Social Security Act, 42 U.S.C. § 1395cc.

2. PCME petitioned the District Court for review of agency action concerning cost reporting years ending June 30, 1970, 1971, 1972, and 1973. The District Court dismissed the claims for pre-1973 cost reporting years for want of jurisdiction. The Court ruled in favor of PCME on the 1973 claims. PCME appealed from the dismissal of the pre-1973 claims, and the Secretary cross-appealed from the decision on the

the Secretary erred in treating the transaction as two unrelated events, and that the regulations, when applied to a single acquisition, are not susceptible to the Secretary's interpretation. We affirm, with minor modification, the judgment of the District Court.

## I. BACKGROUND

### A. MEDICARE

This case arises under Title XVIII of the Social Security Act, known as the Medicare program. 42 U.S.C. §§ 1395–1395rr. This legislation provides for federal reimbursement of medical care for the aged and certain disabled persons. 42 U.S.C. § 1395c. It accomplishes this, in part,[3] through contractual arrangements with medical facilities to be "providers" of such medical care. 42 U.S.C. § 1395cc. These providers afford certain covered medical services to the program's beneficiaries, for which they receive reimbursement from the Government.[4]

A provider is reimbursed for the "reasonable cost" of the services provided, or, if lower, the customary charges for such services.[5] In its 1972 amendments to the Medicare statutes, Congress defined "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Such actual costs include appropriate allowances for depreciation on buildings and equipment, 42 C.F.R. § 405.415(a) (1978), and a reasonable return on equity capital, 42 U.S.C. § 1395x(v)(1)(B); 42 C.F.R. § 405.429 (1978). Assets and equity capital are valued at their historical cost. 42 C.F.R. § 405.415(a), (b) (1978).

The actual reimbursement for these costs is usually effected through a "fiscal intermediary." These private non-government entities are frequently health and accident insurance companies such as "Blue Cross" organizations.[6] The intermediaries serve as HEW's agents in the day to day administration of the Medicare program, 42 U.S.C. § 1395h, making interim monthly payments to providers. At the end of a provider's fiscal year, the intermediary reviews the provider's reimbursement claims and makes a final decision on that year's reimbursable costs. 42 C.F.R. § 405.1803 (1978). If the provider is dissatisfied with the finding, it may request a hearing before the Provider Reimbursement Review Board (PRRB).[7] The decision of the Board, entered after a

---

merits. This Court, by order filed July 10, 1979, transferred the pre-1973 claims to the United States Court of Claims, thus mooting PCME's appeal. This decision, therefore, addresses only the Secretary's cross-appeal of the District Court's decision on the merits.

3. The Medicare program is composed of two parts: Part A, involved here, provides hospital insurance benefits to the elderly, 42 U.S.C. §§ 1395–1395i–2; Part B involves a voluntary supplemental medical insurance program, 42 U.S.C. §§ 1395j–1395w. For more detailed descriptions of aspects of the Medicare reimbursement scheme, see *Fairfax Hospital Ass'n, Inc. v. Califano*, 585 F.2d 602, 603–04 (4th Cir. 1978); *American Medical Int'l, Inc. v. Secretary of HEW*, 466 F.Supp. 605, 609–10 (D.D.C.1979); Homer & Platten, *Medical Provider Reimbursement Disputes: An Analysis of the Administrative Hearing Procedures*, 63 Geo.L.J. 107 (1974).

4. 42 U.S.C. § 1395f. These hospital insurance benefits are funded out of social security taxes, 42 U.S.C. § 1395i, and are paid out of the Federal Hospital Insurance Trust Fund, 42 U.S.C. § 1395g.

5. 42 U.S.C.A. § 1395f(b) (1979 Supp.) provides:
 "(b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to the provisions of section 1395e of this title, be—
 "(1) the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title and as further limited by section 1395rr(b)(2)(B) of this title, or (B) the customary charges with respect to such services; . . . ."

6. The intermediary is nominated by a provider or group of providers, and enters into a contract with HEW. 42 U.S.C. § 1395h.

7. 42 U.S.C. § 1395oo. This review before the PRRB is available only for cost reporting years ended June 30, 1973 or later, Pub.L. No. 92–603, § 243(c), 86 Stat., 1329, 1422, and only if the amount of the claim in controversy is $10,000 or more, 42 U.S.C. § 1395oo (a)(2).

hearing, is *final* unless the Secretary, "on his own motion," reverses or modifies it. 42 U.S.C. § 1395*oo*(f). The provider has a right to judicial review from the Board's decision or from the Secretary's subsequent action. *Id.*

## B. FACTS

The facts of this case are not in dispute.[8] In 1969, Community Hospital of Los Angeles, a California corporation, was a duly authorized Medicare provider. At that time, PCME was also a provider, but was totally independent of Community Hospital. On May 21, 1969, the stockholders of Community Hospital and PCME entered an agreement under which PCME would acquire 100 percent of the stock of Community Hospital in exchange for approximately $7,000,000 worth of PCME stock. Immediately upon the closing of this exchange of stock, on May 30, 1969, PCME made numerous changes in the operation of Community Hospital, including changes of administrator, accountant, attorneys, bank accounts, and directors. Nine months later, on February 25, 1970, PCME liquidated Community Hospital as a corporation, and Community Hospital's assets were distributed to PCME.

It was at all times the intent of PCME to acquire the assets of Community Hospital, and the stock acquisition was a preliminary step to the dissolution of the corporation. This two-step method of acquisition was chosen to accommodate the tax planning desires of the former shareholders of Community Hospital, and to avoid an accelera-

tion provision in a mortgage on Community Hospital property. Further, it is stipulated that the exchange of stock was undertaken between unrelated parties in an arm's length bona fide transaction. There is no dispute over the value of the consideration paid by PCME to the former shareholders of Community Hospital corporation.

In submitting its cost reports for cost reporting years ended June 30, 1970[9] and thereafter, PCME treated the transaction as an acquisition of assets. Such treatment allows PCME to increase (step-up), for Medicare accounting purposes, the value (basis) of the Community Hospital assets to the cost of those assets (including goodwill) to PCME. The basis is stepped up from Community Hospital's basis—the cost of the assets to it. Reimbursement claims for depreciation and return on invested capital are calculated using this basis value. As a result of this increased cost basis, PCME may submit higher reimbursement claims for depreciation and return on invested capital than it would if forced to use as a cost basis the original cost of the assets to Community Hospital. The Secretary refused to recognize this form of acquisition as an arm's length purchase of assets for purposes of Medicare reimbursements, and disallowed PCME's claims for each of its cost reporting years. The IRS, the SEC, and California's Commissioner of Corporations, however, did each approve the transaction as such a purchase of assets.

On April 28, 1975, PCME appealed the decision concerning its 1973 cost year to the PRRB.[10] On August 19, 1975, the PRRB

8. The parties have entered into a stipulation which essentially covers all of the facts underlying this case. The textual recitation of facts is primarily drawn from this stipulation.

9. PCME filed its first cost report with the Secretary on June 30, 1969, the end of PCME's fiscal year, seeking *Medicare reimbursements* for the operation of Community Hospital during the month of June. On May 31, 1969, Community Hospital's former accountants had filed a cost report for Community Hospital to terminate the old corporation's participation in the Medicare program. The defendants did not accept either of these cost reports because they did not recognize the sale of Community Hospi-

tal's stock as a change of ownership of the provider facility. After the dissolution of the Community Hospital corporation in February of 1970, the final report for that corporation was accepted. Simultaneously, a new provider agreement was entered into by PCME, as the new provider, and the Secretary. Consequently, PCME's first accepted cost report as a Medicare provider was for the cost reporting year ended June 30, 1970.

10. The Secretary's decision to not allow a stepped-up basis also affected PCME's reimbursement claims for its 1970, 1971, and 1972 cost reporting years. Under the statute creating the Board, PRRB review is not available for

rendered a decision favorable to PCME's claim. The Secretary, however, chose to review this decision of the PRRB. On October 17, 1975, the Commissioner of Social Security, duly acting for the Secretary,[11] reversed the PRRB and denied PCME's claim.

## C. JUDICIAL REVIEW

PCME filed for judicial review in the District Court pursuant to 42 U.S.C. § 1395 oo (f), under which the Court accepted jurisdiction.[12] The District Court, reversing the Secretary, held that his [13] refusal to allow a step-up in basis or recognition of goodwill following the two-step transaction was unreasonable, arbitrary, and capricious.[14] The District Court remanded the matter to the fiscal intermediary for computation of amounts due PCME, in accordance with the findings of fact and conclusions of law, effectively requiring that the computation be made using the stepped-up basis. One such finding was that goodwill be recognized as the entire difference between the consideration paid for Community Hospital and the value of the Hospital's tangible assets. The District Court also ordered that PCME was entitled to use the stepped-up basis in post-1973 reporting years.

On August 22, 1977, the District Court entered a supplemental order granting PCME's motion for injunction pending appeal. 440 F.Supp. at 310. It enjoined the defendants from withholding further Medicare reimbursements under the terms of its order, for cost reporting years ended June 30, 1973 and thereafter. This order was conditioned upon PCME posting a bond for security equal to 100 percent of the amount to be paid. The Government appeals from the judgment and orders of the District Court.

## II. THE SECRETARY'S ACTION

The Secretary denied PCME's reimbursement claims based upon his interpretation and application of certain HEW Medicare regulations. We will preface our analysis with an overview of these regulations.

## A. REGULATIONS

Among the many regulations the Secretary has promulgated to administer the Medicare program are provisions addressing reimbursement, valuation of assets, and change of ownership of a provider. The Secretary here has applied these regulations so as to deny PCME a stepped-up basis after its two-step acquisition of Community Hospital.

In outlining what is reimbursable, the regulations include costs attributable to long-term assets and capital. See 42 C.F.R. § 405.401–.402 (1978). They provide allowances for depreciation, id. at § 405.415(a), and reasonable return on invested equity capital, id. at § 405.429, (including good-

pre-1973 cost years, see note 7, supra, but PCME did appeal the decision concerning those years to the appropriate intermediary review panel. This panel ruled in PCME's favor but the Secretary reversed. Although these claims were also raised in the District Court, they have been mooted here by transfer to the Court of Claims. See note 2, supra.

11. Under the Medicare Act, it is the Secretary who may reverse or modify a decision of the PRRB. 42 U.S.C. § 1395oo (f). However, section 8.D of HEW's "Statement of Organization, Functions, and Delegations of Authority," 33 Fed.Reg. 5836 (1968), delegates the functions of the Secretary under the Medicare Act to the Commissioner of Social Security. The District Court correctly found that this was a proper delegation, and was properly exercised in this case, a finding which is not appealed. Pacific

Coast Medical Enterprises v. Califano, 440 F.Supp. 296, 305 (C.D.Cal.1977).

12. The principal defendants in this action are the Secretary of Health, Education, and Welfare, the Blue Cross Association (a fiscal intermediary), and Blue Cross of Southern California. Blue Cross of Southern California is under contract with Blue Cross Association to act as the fiscal intermediary between the Secretary and PCME.

13. Because at all times during the events leading to the filing of this case the Secretary of HEW was male, pronoun references will be in the male gender.

14. Pacific Coast Medical Enterprises v. Califano, 440 F.Supp. 296, 307 (C.D.Cal.1977).

will [15]). The amount of such reimbursement depends on the value of the assets, which for these purposes is to be fixed at their historical cost: [16] "the cost incurred by the present owner in acquiring the asset." *Id.* at 405.415(b)(1). In particular, when an ongoing provider is purchased, the cost incurred is the price paid by the purchaser, so long as the sale was bona fide and the price did not exceed the fair market value.[17] The regulations, however, restrict the use of the purchase price when the provider obtains facilities from an organization owned or controlled by the provider. In these cases, the provider may only claim the cost to the owned or controlled organization, not the cost to the provider from that entity. 42 C.F.R. § 405.427(c)(2).[18]

In the context of the contractual relationship between the Secretary and the provider, the regulations state that the agreement terminates when the ownership of the provider changes. *Id.* at § 405.625. This rule is modified for corporations: "If the provider is a corporate body, a transfer of corporate stock would not, in itself, constitute a change of ownership for the purpose of section 1866 of the Act." 42 C.F.R. § 405.626(c).[19] The Secretary applied these regulations to PCME.

### B. INTERPRETATION

The Secretary chose not to view PCME's two-step transaction as one purchase of an ongoing operation.[20] Instead, he characterized the transaction as two independent events, each to be separately evaluated under the Medicare regulations.

The first event was PCME's 100 percent stock purchase, to which the Secretary applied § 405.626(c) (quoted above). Under this application, there was simply a change in Community Hospital's stockholders with no effect on the Medicare program.[21] Emphasizing the legal distinction between a corporation and its shareholders, and that shareholders do not own the corporation's assets, the Secretary concluded that there was no change in ownership of the assets due to the stock purchase. Thus, no revaluation of assets could be allowed at that time.[22]

The second event was the corporate dissolution of Community Hospital. The Secretary recognized a change in asset ownership when the Community Hospital facilities vested in PCME at liquidation, but also found that Community Hospital was an organization "owned or controlled" by PCME within the meaning of 42 C.F.R. 405.427(c)(2). Under that regulation, PCME could not claim as its cost what it paid for Community Hospital's assets, but would be limited to Community Hospital's cost. Thus, the Secretary concluded, since the assets were acquired from a related organization, there could be no revaluation of assets at that time.

The Secretary's interpretation and application of his agency's regulations prohibited

---

15. Provider Reimbursement Manual, HEW-SSA, HIM–15, § 1214 (Nov. 1968 Revision).

16. 42 C.F.R. §§ 405.415(a), .429(b)(2) (1978).

17. The regulation specifically states:

"In establishing the cost basis for a facility purchased as an ongoing operation after July 1, 1966, the price paid by the purchaser shall be the cost basis where the purchaser can demonstrate that the sale was a bona fide sale and the price did not exceed the fair market value of the facility at the time of the sale. . . ." 42 C.F.R. § 405.415(g) (1978).

18. The text of § 405.427(c)(2) is printed in Part III–C–2, *infra.*

19. Section 1866 provides for a contractual agreement between the provider and the Secretary. *See* note 1, *supra.*

20. Consequently, the Secretary did not apply the regulation concerning purchases of ongoing providers to PCME, 42 C.F.R. § 405.415(g) (1978) (*see* note 17, *supra*).

21. *Id.* The Secretary also did not permit PCME to replace Community Hospital, Inc., as the certified provider, as PCME attempted to do as soon as the stock purchase was made. *See* note 9, *supra.* It was not until after the dissolution of Community Hospital in February, 1970, that PCME formally assumed that role.

22. Before assets can be revalued, there must be an acquisition of those assets. 42 C.F.R. §§ 405.415(a)(2), .415(b)(1), .429(b)(ii) (1978).

PCME from using the price it paid for the Community Hospital stock as its cost basis for Medicare claims. According to the Secretary's decision, PCME was denied a step-up in basis in the amount of $6,075,288.[23] This affected PCME's depreciation and return on equity claims, reducing by $147,124 the amount of Medicare reimbursement due PCME for the cost year ending June 30, 1973. This decision similarly[24] affects PCME's reimbursements in all other cost reporting years as well.

## III. DISCUSSION

### A. JUDICIAL REVIEW

In establishing judicial review of the Secretary's action, 42 U.S.C. § 1395oo(f)[25]

**23.** This was broken down as $1,165,228 applicable to fixed assets, and $4,910,000 as goodwill. These figures were reported in the written opinion for the Secretary.

**24.** The figures would not be exactly the same, due to changes in depreciation values, Medicare utilization percentage, etc.

**25.** 42 U.S.C. § 1395oo(f) provides:
"(f) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses or modifies (adversely to such provider) the Board's decision. In any case where such a reversal or modification occurs the provider of services may obtain a review of such decision by a civil action commenced within 60 days of the date he is notified of the Secretary's reversal or modification. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of Title 5, notwithstanding any other provisions in section 405 of this title."

**26.** Chapter 7 of Title 5, referred to in 42 U.S.C. § 1395oo(f) (see note 25, supra) is codified at 5 U.S.C. §§ 701–706.

**27.** 5 U.S.C. § 706, in its entirety, reads as follows:
"§ 706. Scope of review
"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

specifies that the Administrative Procedure Act (APA) is to govern the proper scope and standard of that review.[26] The APA provides that "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions," and that the court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . ."[27]

■ The primary question before us is whether the Secretary may interpret and apply the Medicare regulations above as he has done in denying PCME's claims.[28] Gen-

"(1) compel agency action unlawfully withheld or unreasonably delayed; and
"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
"(B) contrary to constitutional right, power, privilege, or immunity;
"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
"(D) without observance of procedure required by law;
"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

**28.** This is an issue of first impression in the United States Court of Appeals. The stock-purchase-and-dissolution form of acquisition by a Medicare provider has been previously considered by three federal district courts, all of which have rejected the Secretary's position. Homan & Crimen, Inc. v. Califano, [1978] CCH Medicare & Medicaid Guide, ' 29,213 (W.D. Tex.), appeal docketed, No. 78–3364 (5th Cir., Oct. 30, 1978); Memorial, Inc. v. Califano, No. CV 76–3517 RMT (C.D.Cal., March 30, 1978) (companion case 9th Cir. decided today); Pacific Coast Medical Enterprises v. Califano, 440 F.Supp. 296 (C.D.Cal.1977) (this case). A fourth district court has disallowed

erally, when the meaning of a provision within the expertise of an agency is involved, the courts will afford deference to that agency's construction. In such cases, the agency's expertise make it particularly suited to interpret the language. This is especially true when an agency's own regulation is involved, and ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *Montana Power Co. v. Environmental Protection Agency,* 608 F.2d 334, 344–45 (9th Cir. 1979). *See Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

■ The deference which a reviewing court is to afford to an agency's interpretation of its regulations is not total, however. Congress has vested in the court a reviewing function over the action of the agency, including its interpretative decisions. 42 U.S.C. § 1395oo(f), 5 U.S.C. §§ 701–706. We would be abdicating our judicial responsibility if we were to pass on the propriety of the Secretary's interpretation without subjecting it to some degree of scrutiny. As where courts review an agency's construction of a statute which the agency administers, "the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . . ." *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965); *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). Even though the Medicare reimbursement area is complex, and to a great degree left to the Secretary to structure,[29] his interpretations are nonetheless subject to our examination.[30]

■ Our review of the Secretary's construction of the Medicare regulations concerned here involves several phases. We must first examine the interpretation itself in light of the language of the regulations. The words must be reasonably susceptible to the construction placed upon them by the Secretary, both on their face and in light of their prior interpretation and application. The interpretation must sensibly conform to the purpose and wording of the regulations. *Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc.,* 423 U.S. 12, 15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975); *Ruangswang v. INS,* 591 F.2d 39, 43 (9th Cir. 1978); *Hart v. McLucas,* 535 F.2d 516, 520 (9th Cir. 1976).

■ Second, the Secretary's construction must be reviewed in relation to the governing statutes. Initially, this will be a factor in determining whether the regulation can bear the interpretation placed upon it. Existing regulations must be construed in light of the statutory mandates under which they issue. Secondly, the statutory authority will also control the substantive review of the Secretary's new interpretation. Agency regulations must be consistent with and in furtherance of the purposes and policies embodied in the congressional statutes which authorize them. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936). Those which are not are contrary to law and must be set aside. 5 U.S.C. § 706(2)(A). Thus, our deference does not extend to agencies' construction which conflict with statutory directives. *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974). Courts

revaluation under a variation on this situation. There, no dissolution was effected and the attempted revaluation did not occur until a subsequent merger between the purchasing corporation and an independent entity. *American Medical Int'l, Inc. v. Secretary of HEW,* 466 F.Supp. 605, 621–24 (D.D.C.), *appeal docketed,* No. 79–1460 (D.C. Cir., May 4, 1979).

**29.** *Diplomat Lakewood, Inc. v. Califano,* 453 F.Supp. 442, 445 (D.D.C.1978).

**30.** *See, e. g., St. John's Hickey Memorial Hospital, Inc. v. Califano,* 599 F.2d 803 (7th Cir. 1979); *AMI–Chanco, Inc. v. United States,* 576 F.2d 320 (Ct.Cl.1978).

"are not obliged to stand aside and rubber-stamp their affirmation of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Consequently, if the Secretary's regulatory interpretations are found to impede or inhibit congressional will, either on their face or as applied, they must be struck down. We now turn to the substance of the Secretary's action.

### B. CHARACTERIZATION

■ Resolving whether the PCME transaction should be viewed as a single acquisition or multiple transactions nearly determines our consideration of the Secretary's decision. Thus, we must examine the threshold question of this characterization before moving to a detailed review of the regulations involved.

The Secretary has implicitly determined that PCME's action must be viewed as two independent events, each to receive a separate evaluation under the Medicare regulations. His opinion asserts that "[a]ctually, two separate transactions occurred," yet it offers forth no reasoning or supporting authority to substantiate this view. Nor did the Secretary in his arguments to this Court present any reason why the transaction should be viewed as two separate events.

Even conceding our desire to accord deference to the Secretary's judgment, we believe that his view ignores the substance of the transaction. When an agency proposes to define a transaction in a way which deviates from the common understanding, and which is not a definition foreseeably left to the Secretary's discretion to establish, we must require at least some basis before we can say that such a decision is not arbitrary and irrational. If there were some precedent or prior practice in the

Medicare area for this characterization, or even if the Secretary was writing on a clean slate with respect to this type of transaction, we would be inclined to defer to his view. However, such is not the case here.

The characterization of a 100 percent stock purchase and subsequent dissolution is not unique to the Medicare area. It is a question concerning an ordinary business transaction. Its determination does not require expertise in the health care field or in the intricacies of the Medicare reimbursement program. There is no reason to infer that this particular characterization has been specifically left to the unfettered discretion of the Secretary. Moreover, there is no void in other fields with regard to this form of acquisition, for it has been often confronted outside of Medicare.

The common usage and understanding of this transaction is overwhelmingly contrary to the Secretary's characterization. First, this method of acquisition is a common occurrence in this country's corporate business practice and is an accepted method for the purchase of assets. Second, this procedure is recognized as a single transaction in the professional sphere. Generally accepted accounting principles treat this two-step event as a purchase of assets.[31] Third, this transaction has been viewed as one event in other government contexts, both on the state and the federal level. PCME's acquisition was approved as a purchase of assets by the Internal Revenue Service, the Securities and Exchange Commission, and California's Commissioner of Corporations, in accordance with their usual treatment of such events.

Finally, and perhaps most importantly, we note that a characterization which denies that PCME's transaction was a single action acquiring assets infringes upon the congressional policy that those who partici-

---

**31.** Accounting Principles Board Opinion No. 16. The opinions of the Accounting Principles Board are recognized as being authoritative statements of generally accepted accounting principles. Under APB Opinion No. 16, one corporation's purchase of all of the stock of another corporation must be accounted for either as a "pooling of interests" or as a "purchase." There is no dispute between the parties here that PCME's transaction is a purchase rather than a pooling of interests as defined in the opinion.

pate in Medicare be able to receive reimbursement for reasonable costs and return on equity.

Congress has by statute declared that Medicare providers should have the opportunity to recover their reasonable costs. Depreciation expense and return on equity are legitimate costs of doing business,[32] and it is Congress' desire, as evidenced by statute [33] and by implementing regulations [34] that these costs be fully reimbursable. However, unless there is the opportunity for reimbursement for depreciation and return on equity to be based upon the full cost of assets to the present provider, it is not receiving full reimbursement. Thus, to deny such reimbursement to a provider who comes in good faith and engages in a fair, bona fide transaction is inconsistent with Congress' desire that they have the opportunity to receive full payment.[35]

PCME had no notice that the method it chose for acquiring Community Hospital would not be accorded full benefits as a purchase of an ongoing provider. It proceeded in good faith—its choice to structure the purchase as it did was based on considerations independent of the Medicare program. All indications, both within and outside government, suggested that this form of purchase would receive no different treatment than an outright purchase of assets for cash. To deny PCME's act as a single takeover would impermissibly frustrate congressional policy.

We find that the PCME transaction must be considered, for purposes of applying the Medicare regulations, as a single action of acquisition of an ongoing provider, accomplished in two phases. We emphasize that

the Secretary is not bound by the practices of other governmental entities or by accounting practice or common usage. However, where there is no internal basis or support nor compelling reason [36] for the Secretary's action, and it is not clearly committed to his absolute discretion, these external sources are relevant to whether the Secretary acted arbitrarily. We will now proceed to review in accordance with this view the Secretary's application of the regulations to PCME's transaction.

## C. APPLICATION OF REGULATIONS

The Secretary's action is principally the interpretation and application of two Medicare regulations to the present facts. We address each application separately, reviewing them in light of a single takeover transaction.

### 1. *42 C.F.R. § 405.626(c)*

█ The first regulation which the Secretary invokes is § 405.626(c).[37] This regulation provides in pertinent part as follows:

"If the provider is a corporate body, a transfer of corporate stock would not, in itself, constitute a change of ownership for the purpose of section 1866 of the Act. Similarly, a merger of one or more corporations with the participating provider corporation surviving would not generally require a new certification or the execution of a new provider agreement with the surviving entity. . . ." 42 C.F.R. § 405.626(c) (1978).

Section 405.626, however, is not found in the section of regulations concerning reimbursements, but rather it is in Subpart F which governs the contractual relationship

---

**32.** 42 C.F.R. §§ 405.415(a), .429(b)(1) (1978).

**33.** 42 U.S.C. § 1395x(v)(1)(A).

**34.** 42 C.F.R. §§ 405.401–.402 (1978).

**35.** We do not hold that the Secretary is without power to restrict the takeover methods which would qualify for revaluation of assets. Although there may be questions regarding such a restriction's consistency with congressional intent, see Homan & Crimen, Inc. v. Califano, [1978] CCH Medicare & Medicaid Guide, ' 29,-213 (W.D.Tex.), appeal docketed, No. 78–3364 (5th Cir., Oct. 30, 1978), we do not find it

necessary to reach that issue in this case. See note 41, infra.

**36.** The Secretary suggests that rejection of his interpretation will allow providers to avoid repayment of accelerated depreciation. See 42 C.F.R. § 405.415(d)(3) (1978); note 39, infra.

**37.** 42 C.F.R. § 405.626(c) (1978). All textual references to regulations are from Title 42 of C.F.R. unless otherwise noted. These regulations were formerly codified in 20 C.F.R.

between the Secretary and a provider. Specifically, § 405.626(c) relates to the status of the agreement in the event that any shares of the stock of a corporate provider are traded, and must be read along with the preceding section, § 405.625. That section provides in part:

> "A transfer of ownership of a provider of services participating in the health insurance program under an agreement with the Secretary will, under the conditions discussed in section 405.626 render such agreement invalid as between the Secretary and the transferee. In order for the new entity to participate in the program, it must be established that it meets the conditions for participation . . . ."

42 C.F.R. § 405.625(a) (1978).

The thrust of these provisions is clear. Upon a change in ownership of a provider, there may be associated changes in staff, management, and possibly facilities. It is essential for the Secretary to be assured that a satisfactory level of medical care will continue to be forthcoming before the new owners are permitted to participate in the Medicare program. This is effectively accomplished by terminating the provider's contract until the new management qualifies itself to the Secretary's satisfaction. However, although the exchange of even small amounts of a corporation's capital stock is technically a change of ownership, the Secretary has recognized that this will not usually affect the management of a provider or the quality of health care administered. Consequently, § 405.626(c) provides an exception to the contract termination provisions of § 405.625, so that a transfer of corporate stock will not in itself cause a contract to terminate. The use of the phrase "in itself" further indicates that this section is intended to be applied to routine stock transfers. The phrase leaves open the possibility of a different application when unusual circumstances require. A 100 percent stock purchase is not routine in the realm of ordinary stock trading.

The Secretary refers us to no instances in which § 405.626(c) has been given any interpretation beyond this contract context, and we have discovered none. The Secretary's attempt to apply § 405.626(c) to the acquisition process for valuation of assets and reimbursement purposes goes beyond the narrow context of the regulation. We hold, therefore, that the regulation is not susceptible to the interpretation which the Secretary wishes to impose upon it.

### 2. 42 C.F.R. § 405.427(c)(2)

█ The second half of the regulatory basis for the Secretary's ruling is found in the related parties rule of § 405.427(c)(2). This provision states, in part:

> "Where the provider obtains items of services, facilities or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect, the items are obtained from itself. . . . Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. . . ." 42 C.F.R. § 405.427(c)(2).

Section 405.427(c)(2) is intended to prohibit "sweetheart contracts," where a provider effectively purchases goods or services from itself, through an owned or controlled company.[38] If allowed to charge the Medicare program the cost of the service charged by the related party, the provider would ultimately be recovering from the Government not merely cost, but profit on the goods or services as well. Section 405.427(c)(2) allows providers to claim only their actual cost, whether it originally was to the provider or to an owned or controlled company.

When the PCME transaction is viewed as a single acquisition, the Secretary's application of the related parties provision is inappropriate. The Secretary has stipulated that PCME and Community Hospital, Inc. were unrelated parties engaged in a bona fide arm's length transaction, and there is no dispute over the value of the consideration paid by PCME. Thus, the Secretary has essentially conceded that the values relevant to PCME's attempted step-up in basis

---

**38.** *American Medical Int'l, Inc. v. Secretary of HEW*, 466 F.Supp. 605, 618 (D.D.C.1979). *See* *Fairfax Hospital Ass'n, Inc. v. Califano*, 585 F.2d 602 (4th Cir. 1978).

are fair, and there is no suggestion that unjustifiable profits are being charged to Medicare by virtue of the price paid for Community Hospital's assets. PCME's acquisition simply does not fall within the letter or spirit of this regulation.

For the reasons expressed above, we must reject the Secretary's attempt to restrict PCME's revaluation of assets by an interpretation of the Medicare regulations the Secretary has invoked.[39]

When the PCME transaction is properly viewed as a single acquisition of assets, the regulations invoked by the Secretary do not bear the application in this context. We find his construction and application to be arbitrary and erroneous, and must set aside his interpretations.[40]

## D. SCOPE OF DECISION

■ Our decision today is rendered in the context of a transaction which is stipulated

---

**39.** The Secretary's reliance on *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), and its progeny, is misplaced. First, in light of the Secretary's mischaracterization of the PCME transaction, *see* Part III–B, *infra*, we do find the Secretary's interpretation inconsistent with the regulations and clearly erroneous. *Bowles* at 413–15, 65 S.Ct. at 1217. Second, in the Supreme Court's more recent statements on deference to an agency's interpretation of its regulations, it has emphasized the prior consistent construction and application of such regulations. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). For example, in *Udall* the court noted: "The Secretary's interpretation had, long prior to respondents' applications, been a matter of public record and discussion." *Id.* at 17, 85 S.Ct. at 802. *See Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc.*, 423 U.S. 12, 15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975); *Ehlert v. United States*, 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625 (1971); *McLaren v. Fleischer*, 256 U.S. 477, 480–81, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921). As is discussed in the text, there was no notice or suggestion of any kind that the Secretary would apply the policy he did. And because we find the Secretary's interpretation to be arbitrary, erroneous and irrational, there is no inconsistency between our decision today and the Supreme Court's recent opinion in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). The Secretary suggests that affirmation of the District Court will cause administrative difficulties with respect to stock purchases of less than 100 percent and long delays between stock purchase and liquidation. These permutations are not before us and are not relevant to the merits of the present case. The Secretary is empowered to promulgate appropriate regulations to deal with such occurrences, as, for example, has been done by the Internal Revenue Service. *See, e. g.,* I.R.C. § 334(b)(2). The Secretary also asserts that affirmation will allow parties to avoid the recoupment of depreciation payments made to the acquired company which turn out to be in excess of the actual depreciation. *See* 42 C.F.R. § 405.415(d)(3)

(1978). Again, the Secretary can develop regulations to deal fairly with this situation. As for the present case, it appears that PCME has paid, or has offered to pay, the recoupment due upon their purchase of Community Hospital.

**40.** The Secretary here may be attempting to use these regulations as a vehicle to implement a new substantive policy concerning acquisitions. This view finds support in a letter which preceded the Secretary's decision. This letter was written in 1974 by the Deputy Director for Program Policy of the Bureau of Health Insurance, a Mr. Irwin Wolkstein, *to a fiscal intermediary administrator.* The letter set forth BHI's "policy concerning when assets may be revalued and when goodwill is established in corporate transactions occurring before August 1970." *Id.* It proceeded to describe several forms of corporate acquisitions, announcing the reimbursement policy in each case. Stock purchase and dissolution were characterized as two separate events, and not permitting revaluation. In announcing this policy, the Wolkstein letter makes no citation to Medicare regulations.

If considered a promulgation of substantive policy, the Secretary's action is procedurally inadequate. The APA requires agencies to publish "statements of general policy or interpretations of general applicability" in the Federal Register before they can be invoked. 5 U.S.C. § 552(a)(1), (a)(1)(D) (1976). The Secretary's decision is clearly intended to be of general applicability, *Homan & Crimen, Inc. v. Califano*, [1978] CCH Medicare & Medicaid Guide, ' 29,213 (W.D.Tex.), *appeal docketed*, No. 78–3364 (5th Cir. 1978); *Memorial, Inc. v. Califano*, No. CV 76–3517 RMT (C.D.Cal., March 30, 1978), *aff'd* (9th Cir. 1980), and there is no dispute in this case that PCME had no actual notice of what the Secretary's treatment of its transaction would be. Therefore, even if the Secretary's decision is viewed as a promulgation of policy and not as an attempt to interpret agency regulations, his action must be set aside. *See Morton v. Ruiz*, 415 U.S. 199, 232–35, 94 S.Ct. 1055, 1073–74, 39 L.Ed.2d 270 (1974); *St. John's Hickey Memorial Hospital, Inc. v. Califano*, 599 F.2d 803, 814 (7th Cir. 1979).

to be fair, bona fide, and executed at arm's length between unrelated parties. Nothing in this opinion is intended to prevent the Secretary from continuing to carefully examine the substance of acquisitions made by stock purchase and dissolution. Questions of fair market value and appropriate valuation are likewise properly subjected to his careful scrutiny, and transactions between truly related parties may receive a careful review. We are not minimizing the Secretary's authority to scrupulously regulate Medicare reimbursements—we are merely reversing his erroneous assumption that the PCME transaction was not a purchase of an ongoing provider.[41]

■ In summary, we find that the Secretary's characterization of the PCME transaction as two independent events, instead of a single purchase of an ongoing provider, was arbitrary, erroneous and irrational. When the PCME transaction is properly viewed as a single purchase, the regulations invoked by the Secretary do not bear the interpretation and application he attempts to place upon them. Thus, the Secretary's refusal to allow PCME to revalue its assets for Medicare reimbursements was error, and must be set aside.

**41.** We do not today reach the question of whether the Secretary is absolutely prohibited from enacting a policy against revaluation of assets when they are acquired by stock purchase and subsequent dissolution. Whether a properly promulgated policy specifying approved methods of acquiring Medicare providers would be inconsistent with the governing congressional statutes is left for a case in which it is properly presented.

**42.** *Pacific Coast Medical Enterprises v. Califano*, 440 F.Supp. 296, 310 (C.D.Cal.1977). This security required was subsequently modified to a $500,000 letter of credit plus the right to offset overpayments to PCME against amounts owed to Community Hospital and to four other provider hospitals owned by PCME. *Pacific Coast Medical Enterprises v. Califano*, No. CV 75–1769–WMB (C.D.Cal., May 17, 1979) (order modifying Court's order of August 22, 1977).

**43.** *Pacific Coast Medical Enterprises v. Califano*, 440 F.Supp. 296, 310 (C.D.Cal.1977).

**44.** The pertinent sections of Rule 62 reads as follows:

## IV. SUBORDINATE ISSUES

### A. STAY PENDING APPEAL

■ Several subordinate issues have been raised by the Secretary. He argues that the District Court acted improperly in granting injunctive relief in favor of PCME. The order required the Government to prepare an audit of PCME's claims for the cost reporting year ending June 30, 1973, and subsequent years, and to pay the reimbursement amounts due. This payment order was conditioned upon PCME posting bond for the full amount advanced.[42] The Court simultaneously denied the Secretary's motion for a stay of the judgment.[43] The Secretary claims that Rule 62 of the Federal Rules of Civil Procedure[44] entitled it to a stay of the judgment as of right, that the Court thus improperly denied the Secretary's motion for stay, and that the Court's injunction could not be issued under Rule 62(c).

We believe the question is controlled by this Court's decision in *Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975), where we stated:

"The purpose of an injunction issued pursuant to Fed.R.Civ.P. 62(c) is preservation

"(c) Injunction Pending Appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party. . . .

"(d) Stay Upon Appeal. When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

"(e) Stay in Favor of the United States or Agency Thereof. When an appeal is taken by the United States or an officer or agency thereof or by direction of any department of the Government of the United States and the operation or enforcement of the judgment is stayed, no bond, obligation, or other security shall be required from the appellant."

Fed.R.Civ.P. 62(c), (d), (e).

of the status quo until the court of appeals has acted on an appeal from an order granting or denying an injunction. The rule 62(c) injunctions thus have terminated automatically with our disposition of the other appeals. Objections to the validity of a rule 62(c) order could be made only by motion, pending action on the principal appeals." *Id.* at 235.

It is clear that the District Court found its authority to grant the injunction in Fed.R. Civ.P. 62(c).[45] While there appears to be a substantial question as to whether the original judgment of the District Court was one "granting, dissolving, or denying an injunction," Fed.R.Civ.P. 62(c), we do not reach this issue. The Secretary's appeals from the Rule 62(c) injunction are dismissed as moot.[46]

### B. EXTENSION TO POST–1973 YEARS

 Subsumed within this dismissal for mootness are the Secretary's objections to the District Court's extending its order to post-1973 cost reporting years. However, these objections go beyond the procedural aspects to questioning the very jurisdiction of the District Court over claims from those later years. Because these issues may arise

again should PCME seek additional equitable relief concerning these post-1973 cost reporting years, and do arise in the companion case decided today, we will address the jurisdictional question.

There has been much judicial discussion concerning judicial review of Medicare provider claims,[47] so the background will be only briefly related here. In *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the United States Supreme Court construed § 205(h) of the Social Security Act, 42 U.S.C. § 405(h), concerning the availability of judicial review of the Secretary's decision regarding social security benefits. The section provides, in part:

"No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or governmental agency except as herein provided." [48]

This section has been incorporated by Congress into the Medicare Act, rendering *Salfi* important precedent for Medicare cases.[49]

The Supreme Court characterized the statute's prohibition against review of the Secretary's benefits decisions as "sweeping and direct," precluding review outside of the procedures established in the Act. The implication of this finding for the Medicare

**45.** The Court noted in its order that PCME brought the motion for injunctive relief pursuant to Rule 62(c). No other authority for the order was offered. 440 F.Supp. at 308.

**46.** The Secretary did appeal the Rule 62(c) injunction, but not until nearly two years after it was issued. The motion was denied by this Court on July 13, 1979.

**47.** *See Humana of South Carolina, Inc. v. Califano*, 191 U.S.App.D.C. 368, 590 F.2d 1070 (D.C. Cir. 1978); *Dr. John T. MacDonald Foundation, Inc. v. Califano*, 571 F.2d 328 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978) (holding that jurisdiction over disputes in pre-PRRB cost years lies in the Court of Claims); *Association of Am. Medical Colleges v. Califano*, 186 U.S.App.D.C. 270, 569 F.2d 101 (D.C. Cir. 1977); *Trinity Memorial Hosp. v. Associated Hosp. Serv., Inc.*, 570 F.2d 660 (7th Cir. 1977) (same as *MacDonald*); *Hazelwood Chronic & Convalescent Hosp., Inc. v. Weinberger*, 543 F.2d 703 (9th Cir. 1976), *vacated for reconsideration in light of Califano v. Sanders*, 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977); *Whitecliff, Inc. v. United States*, 536 F.2d 347 (Ct.Cl.1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d

361 (1977), (holding that the Court of Claims does have jurisdiction to review pre-1973 claims, under 28 U.S.C. § 1491).

**48.** 42 U.S.C. § 405(h) (1976) provides in full: "Finality of Secretary's decision.

"The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."

**49.** Section 205(h) is incorporated into the Medicare Act "to the same extent . . . applicable . . . to [Title II]." 42 U.S.C. § 1395ii. *See Humana of South Carolina, Inc. v. Califano*, 191 U.S.App.D.C. 368, 373, 590 F.2d 1070, 1075 (D.C. Cir. 1978); *Association of Am. Medical Colleges v. Califano*, 186 U.S.App.D.C. 270, 274, 569 F.2d 101, 105 (D.C. Cir. 1977).

Act has been enunciated by other courts on several occasions.[50] With the § 205(h) language incorporated into the Medicare provisions, a party is likewise prohibited from seeking judicial review of any claim under the Medicare Act, except under the established review procedures. While this has caused some judicial disagreement concerning pre-1973 claims for which there is no provision for judicial review within the Medicare Act,[51] Congress' amendment of the Act to include a path for review now makes that route the exclusive vehicle for appealing the merits of the Secretary's denial of Medicare reimbursement claims. The Supreme Court in *Salfi* further ruled that § 205(h) was not merely a codification of the judicially developed exhaustion doctrine. Rather, it found it to be "a statutorily specified jurisdictional prerequisite" which could not be dispensed with by a "judicial conclusion of futility." 422 U.S. at 766, 95 S.Ct. at 2467.

The import of these decisions upon the present case is apparent. Congress has adopted a statutory scheme which provides one route for judicial review, exclusive of all others. It has determined that the Secretary and his delegated review procedure should have the opportunity to fully consider any Medicare benefit claims before they are submitted to a federal court. For the Medicare provider reimbursement claims, the designated avenue to judicial review is prescribed by 42 U.S.C. § 1395oo and requires appeal to the PRRB, with the Secretary having the opportunity to review the Board's decision prior to court action.[52] The application of this requirement is not discretionary with the District Court—adherence to the procedures of 42 U.S.C. § 1395oo is a prerequisite to the Court's very jurisdiction. Even though the District Court may perceive equities in favor of hearing claims immediately, perhaps even the appearance of futility in forcing a party to pursue the statutory procedure, the District Court is utterly without power to entertain those claims.

The language of § 205(h) is "sweeping and direct," and may at times require a seemingly unequitable result. However, even in the case of claims which appear to rest upon identical questions of law and fact, these procedures will allow the Secretary to affirm this similarity, or to define and resolve any differences which may not be apparent to the Court. The process of administrative review may also provide the agency, perhaps under a different administrator, to reconsider his original decision. Further, if indeed the subsequent claims are quite similar to the original claim, with no unresolved issues presented, review should be expedited and a minimal burden to the provider. It will be the rare case when administrative review of subsequent years' similar claims will be both an undue burden and entirely pointless.

The post-1973 claims which were included in the District Court's Rule 62(c) injunction were not, so far as we can determine, presented to the PRRB. In fact, the cause actually heard before the District Court was limited to a review of the Secretary's action on the 1973 claim. Thus, the 1973 cost reporting year claim is the only claim which has complied with the requirements of 42 U.S.C. § 1395oo, and, therefore, is the only claim upon which the District Court has jurisdiction to act.

We do not believe that this ruling should cause undue delay in resolution of PCME's post-1973 year claims. We are confident that the Secretary will apply our rulings in good faith and with expediency. If in fact the only issue in dispute between the Secretary and PCME in these later claims is the question of revaluation which we decide today, we would expect payment to be made promptly, vitiating any need to appeal to the PRRB at all. And if there are

---

**50.** *See* cases cited in note 47, *supra.*

**51.** *Compare, e. g., Dr. John T. MacDonald Foundation, Inc. v. Califano*, 571 F.2d 328 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978), *with Whitec-*

*liff, Inc. v. United States*, 536 F.2d 347 (Ct.Cl. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

**52.** *See* note 40, *supra.*

other factors complicating those claims, then it would not be appropriate, even absent the jurisdictional bar, for the District Court to consider them prior to exhaustion of administrative remedies.

## C. GOODWILL

■ Regarding the issue of how goodwill should be calculated, we believe that the District Court's order was overbroad, although in this case it may ultimately make no difference. The District Court found that goodwill should be calculated as "the entire excess of the amount of consideration paid for Community Hospital over the fair market value of the tangible assets of Community Hospital." *Pacific Coast*, 440 F.Supp. at 307. From our reading of the record, it appears that the question of how specifically to calculate goodwill was not presented to the District Court. Rather, goodwill was present in the District Court's proceedings only to the extent that it was a part of the equity capital that PCME claimed should have been revalued at the price it paid for Community Hospital. The District Court's judgment should have been limited to declaring that PCME was entitled to the revaluation, and that goodwill was properly includable within the amount of equity capital to be revalued. However, as we indicate more generally below, we are in agreement with the spirit of the District Court's ruling. Insofar as the District Court's formula reflects the computation applicable in the case of a regular purchase of an ongoing Medicare provider, it will be applicable to this case.

## V.

The purchase of an ongoing Medicare provider is not an uncommon event, and the Secretary has provided regulations dealing with the occurrence. In PCME's case, the Secretary has unreasonably chosen to treat the transaction differently. In these proceedings, we are not concerned with the specifics of how assets are valued nor with how amounts are calculated. Rather, we have addressed the Secretary's microscopic treatment of this two-step acquisition. Our findings and conclusions indicate that PCME's situation should not be treated differently from other cases where an ongoing provider's ownership has changed hands, with respect to valuation of PCME's assets. This identifies the applicable basis for treatment, and we leave it to the Secretary and his agents to properly apply the rules and regulations to determine the appropriate amounts to ultimately pay PCME.

In conclusion, we find that the PCME transaction must be viewed as a single event, one purchase of an ongoing Medicare provider. As such, the Secretary's interpretations of the regulations he invokes are arbitrary, erroneous and irrational, and must be set aside. The District Court's order for computation of goodwill is modified to prescribe the computation normally applied when the facility of an ongoing Medicare provider is purchased. Other computations and resolution of PCME's claims based upon the revaluation issue shall proceed similarly. The cause is remanded to the District Court for such proceedings and remands as it shall deem appropriate, consistent with this opinion.

AFFIRMED AS MODIFIED, AND REMANDED.