**SPOKANE VALLEY GENERAL HOSPITAL, INC., et al.**

v.

**The UNITED STATES.**

**No. 445–80C.**

United States Court of Claims.

Sept. 8, 1982.

Thomas H. Brock, Washington, D. C., for plaintiff; Randi S. Nathanson, Washington, D. C., attorney of record. Malcolm J. Harkins, III and Casson, Calligaro & Mutryn, Washington, D. C., of counsel.

Glenn E. Harris, New York City, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Robert Bergstrom and Carel Hedlund, Dept. of Health and Human Services, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

Spokane Valley General Hospital, Inc. ("Spokane Valley"), a provider of Medicare services under Part A of the Medicare Act, 42 U.S.C. §§ 1395 et seq. (1976 & Supp. IV 1980), seeks for the years 1971 and 1972, as part of its reasonable costs of providing those services, a return on the $750,000 it paid for "goodwill." The parties have filed cross-motions for summary judgment. We hold that under the statute and the regulations, the plaintiff is entitled to receive such a return. We therefore grant the plaintiff's motion for summary judgment and deny that of the defendant.

### I.

A.  In 1967, five physicians formed Valley Mission, Inc. ("Valley Mission"),[1] in order to construct and own a for-profit hospital in Spokane, Washington. In February 1968, prior to the facility's completion, the same physicians formed Spokane Valley (hereinafter occasionally referred to as "the original Spokane Valley") to lease the property from Valley Mission and to operate the hospital.

Both before and after the formation of Valley Mission and Spokane Valley, these physicians expended a great deal of time and effort to assure that the hospital would be successful as soon as it opened its doors. By the end of 1968, the physicians, among other things, (1) had arranged for a medical staff of 121 doctors, (2) had screened and interviewed numerous applicants for other positions, (3) had adopted the bylaws, rules and regulations for the hospital, (4) had acquired the requisite state and professional accreditation and licensing for the hospital, (5) had endeavored through various means to develop goodwill and recognition in the community for the hospital, and (6) had leased a substantial amount of the equipment the hospital would require.

Late in 1968, American Medicorp, Inc. ("Medicorp"),[2] which operates a large number of general community hospitals in several states, formed S.V.G.H., Inc. (hereinafter, "the subsidiary"), for the purpose of purchasing Spokane Valley. On December

---

1.  Valley Mission was liquidated in 1971, and the stockholders became partners in the ownership of the real estate described below.

2.  Humana, Inc., acquired and merged Medicorp into itself in 1978. Hereinafter, Medicorp will be used to refer to both.

28, 1968, the purchase was consummated. The subsidiary exchanged 10,000 shares of Medicorp stock, having a fair market value of $750,000, for all of Spokane Valley's capital stock. The 10,000 shares were approximately four-tenths of one percent of Medicorp's voting stock. Spokane Valley's original stockholders retained no control over the hospital's management after the sale was consummated. The purchase agreement obligated the physicians not to compete with the hospital for at least five years.

As a condition of the purchase, Valley Mission was to lease the hospital building and real estate to the subsidiary. On the same day the purchase agreement was signed, the subsidiary entered into a 50-year lease with Valley Mission for the land and hospital building at a rental of $15,000 per month, or a total of $9 million over the life of the lease.

In early January 1969, in accordance with the parties' intentions at the time the purchase and lease were agreed to, Spokane Valley was merged into the subsidiary. The subsidiary, as the surviving corporation, took Spokane Valley's corporate name. One month later, Spokane Valley opened its doors and began operations. Spokane Valley apparently had immediate success. In its first year, the hospital had a 59 percent occupancy rate.

Spokane Valley accounted for the transaction on its books by treating the $750,000 of Medicorp stock as having been exchanged solely for goodwill of that value. Spokane Valley's independent auditors and the Securities and Exchange Commission approved this accounting treatment, as did two accountants employed by Spokane Valley's "fiscal intermediary," Blue Cross-Washington/Alaska ("Blue Cross"), which was responsible for making initial provider reimbursement determinations (see below).

B. Pursuant to a written agreement with the Secretary of Health, Education and Welfare, now of Health and Human Services ("the Secretary") (see 42 U.S.C. § 1395cc (1976 & Supp. IV 1980)), Spokane Valley was entitled to be reimbursed from Medicare funds for the reasonable cost of providing Medicare services. See 42 U.S.C. § 1395x(v) (1976 & Supp. IV 1980). Spokane Valley filed cost reports with Blue Cross, and Blue Cross determined Spokane Valley's entitlement to reimbursement. See 42 U.S.C. § 1395g (1976 & Supp. IV 1980); 42 C.F.R. § 405.453(f) (1980).[3]

Spokane Valley submitted cost reports seeking reimbursement for the years 1971 through 1975 of a return on the $750,000 paid for the original Spokane Valley. Section 405.429 of the Medicare regulations allows a proprietary provider to a return on its equity capital invested in Medicare-related assets (see below). Although Medicare reimbursed Spokane Valley for a return on the $750,000 for the years 1969 and 1970, Blue Cross refused to reimburse Spokane Valley for a return thereafter on the ground that the $750,000 was not properly includable in Spokane Valley's equity capital.

Spokane Valley first appealed the determinations for 1973, 1974, and 1975. For claims arising after June 30, 1973, Congress has authorized a provider to appeal a fiscal intermediary's determination to the Provider Reimbursement Review Board ("the Board") if the amount in controversy is at least $10,000. 42 U.S.C. § 1395oo (1976 & Supp. IV 1980); 42 C.F.R. §§ 405.1835 et seq.

The Board affirmed Blue Cross's denial of a return on the $750,000 for 1973 through 1975. The Board's decision rested on three grounds. First, it ruled that as a result of the entire transaction, the subsidiary received nothing more from the original Spokane Valley than a "right to negotiate a lease" with Valley Mission, so that the

---

**3.** Until 1976, the Medicare regulations were located in Title 20 of the Code of Federal Regulations. Since that time, they have been located in Title 42 (although the section numbers have stayed largely the same). Unless otherwise noted, regulations will be cited to Title 42 of the 1980 edition of the C.F.R.

$750,000 represented merely an opportunity for the subsidiary "internally" to generate goodwill in the future, and that internally generated goodwill cannot be included in equity capital. Second, the Board concluded that the goodwill was internally generated for the additional reason that Spokane Valley had not begun operations or earned income until after the transaction was completed. Finally, the transaction itself was deemed to be a "pooling of interests" rather than a "purchase of assets," so that recognition of the $750,000 as goodwill was improper under generally accepted accounting principles.

One Board member dissented, stating that the $750,000 represented prepaid rent (over the 50-year lease). He apparently would have permitted the payment to be amortized and reimbursed over the life of the lease.

Pursuant to the statute providing judicial review of Board decisions, Spokane Valley filed suit in the United States District Court for the Eastern District of Washington. The district court overturned the Board's decision because it was "unsupported by substantial evidence" and was "erroneous in its legal conclusions." *Spokane Valley General Hospital, Inc. v. Harris*, No. C–78–131, slip op. at 5 (November 24, 1980). An appeal of that decision is pending before the Court of Appeals for the Ninth Circuit.

After the Board's decision, Spokane Valley sought review of Blue Cross's initial adverse determination for the years 1971 and 1972. Congress has provided for no formal administrative review of claims arising on or prior to June 30, 1973; however, the regulations require the fiscal intermediary to provide a review hearing where the amount in controversy exceeds $1,000. 42 C.F.R. § 405.1809.

Although the Blue Cross hearing officer who reviewed Spokane Valley's claims for 1971–72 was not bound by the Board's determination of the 1973–75 claims, he adopted the Board's "reasoning and conclusions." In addition, the hearing officer held that the $750,000 should not be included in

equity capital because the transaction was "a purchase of stock and not an acquisition of assets."

In a decision issued in May 1979, the Health Care Financing Administration on behalf of the Secretary affirmed the hearing officer's decision. (Although the regulations do not provide for such review, the Eighth Circuit held in *St. Louis University v. Blue Cross Hospital Service*, 537 F.2d 283, *cert. denied*, 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976), that a hearing officer's decision involving the interpretation of statutes or regulations cannot become final until reviewed by the Secretary).

Spokane Valley filed a timely petition in this court, seeking a return on the $750,000 for the years 1971 and 1972.

## II.

After oral argument in this case, the government filed a "suggestion of lack of subject matter," arguing that the Supreme Court's recent decision in *United States v. Erika*, —— U.S. ——, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), indicates that this court does not have jurisdiction over pre-1973 claims under Part A of the Medicare Act.

In *Erika* the Supreme Court reversed our decision that we had jurisdiction to review determinations of amounts due providers under Part B of Medicare. The Supreme Court held that in the statute dealing with determinations of the amount of Part B claims, "Congress deliberately intended to foreclose further review [beyond the Secretary] of such claims." —— U.S. at ——, 102 S.Ct. at 1654. The only question the Supreme Court discussed was whether this court has jurisdiction over Part B Medicare claims. It gave a negative answer because it concluded that Part B Medicare determinations are not judicially reviewable.

Prior to our *Erika* decision, we held several times that we have jurisdiction over Part A Medicare claims. *See, e.g., Whitecliff, Inc. v. United States*, 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). Our panel is bound by those decisions. The

government has not requested us to hear the case *en banc* to reconsider the jurisdictional issue in light of *Erika.*. The full court, however, has decided that in view of the significant differences between the statutory provisions dealing with Parts A and B of Medicare, it will not reconsider its decisions that it has jurisdiction over Part A cases.

■ We accordingly proceed to determine the merits of this case. In doing so, we shall apply our traditional narrow scope of review in Part A cases. We decide only whether the fiscal intermediary's denial of reimbursement is consistent with constitutional requirements, the statutes, and the regulations. *Valley View Community Hospital v. United States*, 231 Ct.Cl. ——, 679 F.2d 857 (1982); *Whitecliff, Inc.*, 210 Ct.Cl. at 58, 536 F.2d at 351; *Goldstein v. United States*, 201 Ct.Cl. 888, 889, *cert. denied*, 414 U.S. 974, 94 S.Ct. 287, 38 L.Ed.2d 217 (1973).

### III.

Providers of Medicare services are entitled under Part A of the act to be reimbursed for the "reasonable cost" of those services. 42 U.S.C. § 1395f(b) (1976 & Supp. IV 1980). Section 1395x(v) of Title 42 defines "reasonable cost" as "the cost actually incurred" and provides that the Secretary shall establish by regulation "the method or methods to be used, and the items to be included, in determining" whether an incurred cost is reasonable. The statute requires those regulations to "take into account both direct and indirect costs of providers of services ... in order that ... the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] ... will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [Medicare] ...." 42 U.S.C. § 1395x(v)(1)(A) (1976). The statute

also requires that for "proprietary" providers (i.e., those operated for profit) the regulations "shall include provision for specific recognition of a reasonable return on equity capital ... invested in the [health care] facility and used in furnishing" Medicare services. *Id.* at § 1395x(v)(1)(B); *see also Stevens Park Osteopathic Hospital, Inc. v. United States*, 225 Ct.Cl. ——, ——, 633 F.2d 1373, 1382–83 (1980) (describing this provision and its legislative history).

The Secretary has promulgated regulations defining "reasonable cost." 42 C.F.R. part 405, subpart D. Section 405.429(a)(1) of those regulations states that a "reasonable return on equity capital invested and used in the provision of patient care is allowable as an element of reasonable cost of covered services furnished to beneficiaries by proprietary providers." Section 405.429(b) prescribes the basis for calculating a proprietary provider's equity capital. That calculation includes "[w]ith respect to a facility or any tangible assets of a facility acquired before August 1970, the excess of the price paid for such facility or assets [to the extent reasonable] over the fair market value of tangible assets at the time of purchase." 42 C.F.R. § 405.429(b)(3).

■ In the Provider Reimbursement Manual (cited as "HIM–15"), the Secretary has interpreted "the excess of the price paid," which section 405.429(b)(3) includes in equity capital, to be equivalent to "goodwill." HIM–15 § 1214. That section of the manual states that "[t]he amount of goodwill is determined in accordance with generally accepted accounting principles."[4] Those principles recognize goodwill only when acquired in a bona fide, arm's-length transaction. R. WIXON, W. KELL & N. BEDFORD, ACCOUNTANT'S HANDBOOK 19–14 (5th ed. 1970) [hereinafter cited as WIXON, ET AL.]. Goodwill is described as the "excess

---

4. Generally accepted accounting principles consist of the official publications of the American Institute of Certified Public Accountants (i.e., Opinions of the Accounting Principles Board, Financial Accounting Standards Board Statements, and Accounting Research Bulletins). Where there is no official publication, the consensus of the accounting profession, as manifested for example in textbooks, determines generally accepted accounting principles. *See* J. BURTON, R. PALMER & R. KAY, HANDBOOK OF ACCOUNTING AND AUDITING 45—4–5 (1981) [hereinafter cited as BURTON, ET AL.].

of the cost of an acquired company over the sum of identifiable net assets," both tangible and intangible. *Accounting Principles Board Opinion No. 17* ¶ 1 (AICPA 1970); *see also* G. CATLETT & N. OLSON, ACCOUNTING FOR GOODWILL xv (AICPA Research Study No. 10, 1968) [hereinafter cited as CATLETT & OLSON] ("the difference between the total value of an enterprise and the aggregate value of its separable resources and property rights, less liabilities"); BURTON, ET AL., *supra*, at 30–28; WIXON, ET AL., *supra*, at 19–14.

## IV.

■ On their faces, the statute, the regulations, and generally accepted accounting principles seem to indicate that a return on the $750,000 Medicorp paid to acquire the hospital was a reasonable cost for which Spokane Valley is entitled to reimbursement. The acquisition of Spokane Valley took place before 1970. Medicorp obtained the business in a bona fide, arm's-length transaction. No one has suggested that $750,000 was an unreasonable price to pay for what Medicorp acquired. Since the acquisition, Spokane Valley and its assets have been used in part to provide services to Medicare patients. Accordingly, "the excess of the price paid for such facility or assets over the fair market value of tangible assets" (i.e., $750,000–0) should be included in Spokane Valley's equity capital, on which Spokane Valley is entitled to a return. *See* 42 C.F.R. § 405.429(b)(3).

The government makes several arguments to support the Board's contrary conclusion. They are unpersuasive.

A. Section 1214 of the Provider Reimbursement Manual, after noting that the amount of goodwill is to be determined according to generally accepted accounting principles (*see* the discussion, *supra*, at p. 776), states that "internally generated" goodwill, as opposed to "purchased" goodwill (as determined by those principles) is not to be included in equity capital. According to the government, the goodwill Medicorp acquired for $750,000 was "internally generated" and, consequently, may not be included in equity capital.

1. The Board concluded that because Spokane Valley had no earnings history prior to the transaction, Medicorp had not "purchase[d] goodwill" but rather had acquired "internally generated" goodwill. The Board stated that goodwill represents a premium paid for a business expected to earn supernormal profits; that an expectation of above-average profits cannot exist without a prior record of profitability; and that since Spokane Valley never operated until after the transaction, no such record existed. According to the Board, the enhanced earnings Medicorp expected would result from the anticipated efforts of management after the hospital opened. The Board concluded that Medicorp paid the $750,000 for the opportunity to make the hospital profitable—that is, it acquired only the opportunity to generate goodwill, and not any existing goodwill.

■ The Board's decision is based on an overly technical definition of goodwill that is not justified by generally accepted accounting principles. Although conceptually goodwill is a premium representing the above-average profit potential of a business, the expectation of profitability need not be based solely on a record of past earnings. Rather, "[a]ll factors likely to have a bearing on the profits of the next few years should be taken into account.... It is desired to find the level of earnings that will be realized as a result of conditions already implicit in the situation and that can be secured only through purchase." WIXON, ET AL., *supra*, at 19–27; *see also* CATLETT & OLSON, *supra*, at 17–18 (listing 15 factors that can result in superior earning power).

At the end of 1968, Spokane Valley was ready to open. Its owners had made extensive efforts over several years to assure the hospital's immediate success. They had obtained a large medical staff, had acquired requisite licensing and accreditation, had conducted extensive public relations, and had instituted a detailed internal management system (e.g., bylaws, staff rules, etc.). It would have cost Medicorp a great deal of

money and time to duplicate those efforts. The extensive preparations designed to enable Spokane Valley to be profitable from the outset significantly increased the value of the enterprise. *See* J. YANG, GOODWILL AND OTHER INTANGIBLES 29 (1927) (defining goodwill as everything giving an established business an advantage over one started from scratch); *cf.* BURTON, ET AL., *supra*, at 2–23 (cost of developing a new business is an "intangible asset").

This added value of the property constituted goodwill, for which Medicorp was willing to, and did, pay a substantial amount. Despite the absence of prior earnings of Spokane Valley, Medicorp's investment paid off immediately, since the hospital was a success as soon as it opened its doors a month after Medicorp acquired it.

2. In its decision covering the 1973–75 claims, which the Blue Cross hearing officer adopted in this case (see IB *supra*), the Board refused to recognize the goodwill on the alternative ground that under generally accepted accounting principles the transaction between Medicorp and the original Spokane Valley was not a purchase of assets but a pooling of interests, under which assets are not revalued and goodwill is not established. In its briefs the government merely alludes once to this ground of the Board's decision but does not argue in support of it. We therefore deem the government to have abandoned this point, and do not discuss it further.

█ B. The government's other major contention is that goodwill may be recognized only when it is acquired in connection with the acquisition of tangible assets. The government argues that Medicorp acquired no tangible assets of Spokane Valley but only stock and that in any event the long-term lease of the hospital facilities it obtained was not a tangible asset.

1. In support of its contention that the acquisition of stock was not an acquisition of assets that created recognizable goodwill, the government relies upon cases such as *Monterey Life Systems, Inc. v. United States*, 225 Ct.Cl. ——, 635 F.2d 821 (1980),

holding that one who merely acquires all the stock of a Medicare provider is not entitled to a return on that investment. The rationale of those decisions is that the acquisition of stock is not an acquisition of the underlying assets, that under the regulations a provider is entitled to a return only on assets used to furnish medical services, and that stock does not serve that function.

Unlike the providers in those cases, however, shortly after Medicorp's subsidiary acquired Spokane Valley's stock, Spokane Valley was merged into the subsidiary as an integral part of the entire acquisition transaction. The effect was that Medicorp in fact acquired the assets and not just the stock of Spokane Valley. In that situation, a different rule applies.

That is the teaching of our recent decision in *West Seattle General Hospital v. United States*, 230 Ct.Cl. ——, 674 F.2d 899 (1982). In that case, a corporation formed a subsidiary to acquire 100 percent of the stock of a Medicare provider, with the intent of subsequently merging the provider into the subsidiary. For unexplained reasons, the merger was not accomplished for more than a year after the stock purchase. The government treated the transaction as two separate and independent steps, the stock acquisition and the merger. The effect of this treatment was to reduce the provider's reimbursable costs because the cost of the acquired assets and goodwill, upon which reimbursement was based, was the cost to the original provider rather than the higher cost the acquiring firm actually paid for the stock.

We held, however, that "the stock purchase and the merger" were a single "integrated transaction." 230 Ct.Cl. at ——, 674 F.2d at 904–05. We rejected the Secretary's theory because "it ignores the plain substance of the transaction not to recognize that the stock purchase and the merger had no significant separate purposes." *Id.* at ——, 674 F.2d at 904. We stated that the "key" to the case was the fact that we were dealing with an "integrated transaction." *Id.* at ——, 674 F.2d at 905. We

ruled that the Secretary's actions took "no count [sic] of the transactions as they actually took place, and so those actions clearly fail to meet the governing statutory requirement that reimbursement is due on 'actual' costs." *Id.* at ——, 674 F.2d at 904.

On this aspect of the present case, *West Seattle* controls. Here, as in that case, the stock acquisition and merger were component parts of a single integrated transaction. When the purchase and lease agreements were entered into, Medicorp intended to merge Spokane Valley into its subsidiary. The merger took place less than a week after the stock acquisition, which makes this a much stronger case than *West Seattle*, where the actual merger did not take place until a year later.

We therefore hold that through this transaction, Medicorp acquired the assets of Spokane Valley.

▪ 2. The government contends that even if this transaction is viewed as an acquisition of assets rather than of stock, the goodwill Medicorp purchased is not recognizable because it was not obtained in connection with the acquisition of tangible assets. In fact, however, Medicorp did acquire tangible assets. Viewing the transaction realistically, it acquired the assets with which Spokane Valley would and did provide hospital services.

An integral and essential part of the transaction, without which it would not have taken place, was the lease from Valley Mission to Medicorp's subsidiary of the hospital facilities for 50 years at a fixed rent. This lease gave Spokane Valley virtually the identical interest it would have had if it had directly acquired the facilities. For the term of the lease, Spokane Valley had complete control over the facilities and could operate them as it saw fit for 50 years. As a practical matter, the lessors of the facilities retained only the right to collect rent; their stock interest in Medicorp was so small (approximately 0.4 percent) that they had no power to influence Medicorp's decisions. *See Financial Accounting Standards Board Statement No. 13* ¶ .063 (AICPA 1976) ("Accounting for Leases") [herein-

after cited as *SFAS No. 13*] ("regardless of whether substantially all the benefits and risks of ownership are transferred [see below], a lease, in transferring for its term the right to use property, gives rise to the acquisition of an asset . . ."); BURTON, ET AL., *supra*, at 2–22–23.

For purposes of determining whether under Medicare Spokane Valley is entitled to a return on the goodwill Medicorp thus acquired, it is immaterial that the acquisition took the form of a long-term lease rather than a transfer of assets. According to generally accepted accounting principles, "a lease [that] transfers substantially all the benefits and risks incident to the ownership of property should be accounted for as the acquisition of an asset" because "the economic effect . . . is similar, in many respects, to that of an installment purchase." *SFAS No. 13, supra*, at ¶ .060.

As noted (*supra* pp. 776–777), the regulations entitle a proprietary provider to a return on goodwill "[w]ith respect to a facility or tangible assets of a facility acquired before August 1970." This regulation recognizes goodwill in connection with the acquisition of both a facility or its tangible assets. When Medicorp by the lease obtained the right to operate the hospital for 50 years, it acquired the Spokane Valley facilities which included the tangible assets of the hospital. It is immaterial that the lessors retain title to the hospital and that the land and building will revert to them after 50 years.

The relevant principle of the Medicare statute and regulations is that "[a] reasonable return on equity capital invested and used in the provision of patient care" should be reimbursed to a provider. 42 C.F.R. § 405.429(a)(1). The $750,000 that Medicorp paid to acquire Spokane Valley's facilities for 50 years was "equity capital invested and used in the provision of patient care." Spokane Valley is entitled to a return on that equity capital.

CONCLUSION

The plaintiff's motion for summary judgment is granted, and the defendant's cross-

motion for summary judgment is denied. The case is remanded to the Trial Division for further proceedings pursuant to Court of Claims Rule 131(c)(2). If it proves appropriate or necessary, the trial judge may remand the case to the Secretary, Department of Health and Human Services, for further proceedings.