AMERICAN MEDICORP, INC., et al., Appellees/Cross-Appellants,

v.

Richard S. SCHWEIKER, Appellant/Cross-Appellee.

Nos. 81–5370 and 81–5410.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1982.

Decided Oct. 22, 1982.

As Amended on Rehearing Aug. 18, 1983.

* The Honorable Luther M. Swygert, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

Henry Eigles, Health & Human Services, Baltimore, Md., for Medicorp.

Thomas H. Brock, Casson, Caligaro & Mutryn, Washington, D. C., argued, for

Schweiker; Malcolm J. Harkins, III, Casson, Caligaro & Mutryn, Washington, D. C., on brief.

Before BROWNING, TANG and FARRIS, Circuit Judges.

PER CURIAM:

This is an appeal of consolidated cases. In the interest of clarity, we will discuss the facts and issues of each in turn.

*The Doctors' Hospital Transaction*

The district court granted summary judgment to the plaintiff, American Medicorp, Inc. (AMI), in its claim for Medicare reimbursement. The Secretary of Health and Human Services appeals, contending that certain of AMI's claims should be disallowed. We affirm.

The issue here arises from AMI's acquisition of Doctors' Hospital and its claims for reimbursement based on the cost of acquisition. The facts show that prior to December 28, 1969, Doctors' Hospital of San Leandro was owned and operated by Doctors' Hospital of San Leandro, Inc. (Doctors' Inc.) and Estudillo Properties, Inc. (Estudillo). Doctors' Inc. and Estudillo were owned by the same individuals.

Pursuant to an agreement between AMI and Estudillo, AMI sought to acquire Doctors' Hospital from Estudillo. Doctors' Inc. and Estudillo merged, with Estudillo the survivor. Then AMI, through its wholly owned subsidiary, acquired 100% of the stock of Estudillo in exchange for stock in AMI. The following day, December 29, 1969, AMI merged its subsidiary into Estudillo, with Estudillo the surviving corporation.

Pursuant to 42 U.S.C. § 1395g and 42 C.F.R. § 405.453(f), AMI submitted reports for the fiscal years ending December 31, 1973 and 1974, seeking reimbursement for capital costs based on the price paid for the stock. The Secretary disallowed AMI's claims. These denials were based on two

grounds, first, that the acquisition of 100% of the stock did not represent an acquisition of assets or a change of ownership, and, second, that the liquidation of the subsidiary into Estudillo was a transaction between related parties, preventing recognition of goodwill. See 42 C.F.R. § 405.427. The district court held that the transaction constituted a purchase of assets, following the authority of *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123 (9th Cir. 1980).

We agree that the acquisition of Doctors' Hospital is so controlled and affirm the decision of the district court. In *Pacific Coast,* stockholders of two Medicare providers entered into an agreement under which Pacific Coast Medical Enterprises (PCME) exchanged PCME stock for 100% of the stock of the other hospital corporation. Immediately upon closing this exchange, PCME took over the operations of the acquired hospital and nine months later liquidated the acquired hospital. The assets of the dissolved corporation became assets of PCME. PCME treated this transaction as an acquisition of assets, but the Secretary refused to recognize it and disallowed PCME's claims for Medicare reimbursement. The district court reversed the Secretary's decision and this court affirmed.

■ With a minor variation in the transactions involved, this case is indistinguishable from *Pacific Coast.* In *Pacific Coast,* the acquiring corporation—PCME—merged with the acquired corporation, and PCME survived. In this case, AMI's subsidiary, the acquiring corporation, merged with the acquired corporation but it was the acquired corporation that survived. The sole reason in this case that the acquired rather than the acquiring corporation survived was to avoid a mortgage acceleration clause. The end result was the same as the purchase in *Pacific Coast*—the two corporate entities involved (AMI's subsidiary and the acquired corporations) merged and the assets remained in the surviving corporation.

AMI's intent was to acquire the assets of Estudillo. The transaction was at arms-length between unrelated parties. A 100% stock purchase and subsequent dissolution of the purchased corporation is a common method of acquisition of assets and was so carried out here as an ordinary business transaction. This transaction, then, is controlled by our decision in *Pacific Coast Medical Enterprises;* the district court's decision with regard to Doctors' Hospital is AFFIRMED.[1]

*The National Group Transaction*

In this case, AMI claimed entitlement to Medicare reimbursement for goodwill and accelerated depreciation based on AMI's acquisition of five hospitals (National Group).

The district court granted the Secretary's motion for summary judgment, finding that AMI had not acquired the hospitals within the time required by the relevant reimbursement regulations. We reverse in part and affirm in part.

Prior to December 29, 1969, the National Group hospitals were owned and operated by National Hospital Corp. Pursuant to a binding agreement dated December 29, 1969, National Hospital Corp. agreed to sell the National Group to AMI. AMI immediately entered into possession of the facilities and exercised complete control over the management, personnel, and operations in accordance with a management agreement dated January 1, 1970. This custody was so complete that AMI received pre-tax profits, was liable for any losses, and treated the facilities as owned facilities on its profit-and-loss statements.

*Goodwill*

Between the time of the execution of the sale agreement and its closing March 31, 1971, the regulations concerning goodwill were revised. 42 C.F.R. § 405.429(b)(2), the relevant regulation, provides that goodwill shall not be included in equity capital with respect to a facility acquired on or after August 1, 1970.

---

1. We note that *Pacific Coast Medical Enterprises* was recently criticized in *Richey Manor, Inc. d/b/a Rickey Manor Nursing Home v.* *Schweiker,* 684 F.2d 130 (D.C.Cir.1982). We are, of course, bound by our own circuit's precedent.

The issue is whether AMI acquired the hospitals before August 1, 1970. The Secretary contends that "acquire" is synonymous with "transfer of legal title," but cites no authority for this interpretation. Building on this foundation, he argues that AMI's management of the hospitals prior to August 1, 1970, was clearly not a purchase and so falls outside the time limits of the regulations.[2]

■ AMI contends that it "acquired" the National Group when the management agreement went into effect, and we agree. The standard Medicare agreement between a provider and the Bureau of Health Insurance provides that a change of ownership occurs when "a provider enters into a relationship with another company, for example, by the creation of a parent company, or a subsidiary managing firm, as the result of which the new company will exercise authority for fixing policies for the operations of the provider" [Administrative Record 218–219]. This agreement itself reflects the Secretary's acknowledgement that in some circumstances the exercise of authority over a provider indicates that the provider has been "acquired."

Prior to the effective date of the change in the regulations, AMI entered into a binding contractual obligation to purchase the National Group hospitals. The delay in closing was due to the practical problems inherent in liquidating a publicly-owned corporation. For example, the transaction required the formality of shareholder approval as a condition subsequent. This is a time-consuming process requiring the participation of the Securities Exchange Commission as well as the shareholders and the corporation.

The evidence establishes that AMI received equitable title through the purchase agreement of December 29, 1969, and exercised possession and control over the facilities at the inception of the January 1, 1970 management agreement. This case is no different from any other in which the purchaser is regarded as the owner of the land for many purposes. The seller "retains only a legal title as security. In substance [the seller] is in the position of a mortgagee." *S.R.A., Inc. v. Minnesota,* 327 U.S. 558, 565, 66 S.Ct. 749, 754, 90 L.Ed. 851 (1946); *cf. Huddleston v. United States,* 415 U.S. 814, 820, 94 S.Ct. 1262, 1267, 39 L.Ed.2d 782 (1974) ("acquire" defined as "possession" or "control"); *see also Lykes Bros. Steamship Co., Inc. v. United States,* 513 F.2d 1342 (Ct.Cl.1975) (decision guided by Treasury Regulation 1.48–2(b)(6), which states, "Property shall be deemed to be acquired when reduced to physical possession, or control").

The Medicare agreement cited above and the case law persuade us that AMI acquired the National Group at the inception of the management agreement, thus it was acquired prior to August 1, 1970.

Because we find that AMI fulfilled the acquisition requirement within the meaning of the Medicare regulations, and is entitled to reimbursement for goodwill, the district court's decision with regard to goodwill is REVERSED.

*Accelerated Depreciation*

■ The regulations for accelerated depreciation were also revised before the closing of the sale agreement May 31, 1971.

The relevant provisions of the regulation provided that accelerated depreciation would be available for

Depreciable assets acquired before [August 1, 1970], where no election to use straight-line or accelerated depreciation was in effect on such date and the provid-

---

**2.** The Secretary also cites 42 C.F.R. § 405.-429(b)(1) which requires an "investment" and argues that AMI did not give over its consideration until March 31, 1971 and only then made its investment within the regulations.

The Secretary's reliance on § 405.429(b)(1) is misplaced. That section of the regulation governs computation of the return on equity capital and does not purport to govern the question we must answer here. Naturally, computation of the return on equity capital requires an "investment" upon which to base the computation. Nothing in that regulation, however, requires that the investment be made prior to August 1, 1970. Only the acquisition must be accomplished by that time.

er was participating in the program on such date; or

Depreciable assets of a provider where a valid contract was entered into by a provider participating in the program before February 5, 1970, for construction, acquisition, or for the permanent financing thereof and such contract was binding on a provider on February 5, 1970, and at all times thereafter.

42 C.F.R. § 405.415(a)(3)(ii)(B) & (D).

Under both subsections of the regulation, accelerated depreciation is available to a provider who was "participating in the program" on or before the relevant date.

The government argues that AMI was not a participating provider until after March 31, 1971, the closing date of the sale agreement, thus, AMI cannot obtain accelerated depreciation under either provision.

AMI responds that the "participating provider" language in the regulations should not be applied to the acquisition of entire facilities; that the regulations contemplate the acquisition of assets short of entire facilities. Alternatively, AMI argues since we have held that AMI "acquired" the hospitals at the time of the agreement, that they should be "deemed" to have been participating providers at the relevant time. Finally, AMI argues that not to allow accelerated depreciation would result in an illegal retroactive application of the regulation to them.

We are unable to accept any of AMI's arguments. We cannot carve an exception to the regulations on the basis that the regulations do not contemplate the situation before us. Neither are we able to "deem AMI a participating provider." Finally, the proposed regulation was published February 8, 1970, 35 Fed.Reg. 2593, and gave notice that it would become effective August, 1970.

We must apply the terms of the regulation. Our review of the record shows that substantial evidence supports the finding that neither AMI nor its subsidiaries were participating providers until April 1, 1971. We acknowledge that AMI had acquired a provider by the relevant time, but we cannot say that AMI itself was a participating provider.

The Administrative Record before us reveals that the five hospitals involved "continued to file their cost reports as participating providers in their old form up through March 31, 1971. A new provider number was not issued until April 1, 1971." Administrative Transcript, V. 1, p. 469. Testimony of Mr. Irwin Cohen, Chief of Determinations Policy Section, the Division of Provider Reimbursement and Accounting Policy for the Bureau of Health Insurance.

AMI has made no showing that it filed the Section 1866 agreement with the Secretary, *see* 42 U.S.C. § 1395cc any time before April 1, 1971. Thus, we conclude that while AMI had "acquired" the hospitals at the time of the purchase and management agreements, it was the owner of a provider, and not a participating provider.

The district court's decision that AMI is not entitled to accelerated depreciation is AFFIRMED.