BEVERLY GLEN HOSPITAL, et al.

v.

The UNITED STATES.

No. 446–80C.

United States Claims Court.

Sept. 27, 1983.

Thomas H. Brock, Washington, D.C., for plaintiff; Casson, Calligaro & Mutryn, Washington, D.C., of counsel.

Glenn E. Harris, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant; Carel Hedlund, Washington, D.C., Office of Gen. Counsel, Dept. of Health and Human Services, of counsel.

MEMORANDUM OF DECISION

HARKINS, District Judge.

Plaintiffs' petition (now complaint) was filed in the United States Court of Claims on August 20, 1980, to recover unreimbursed costs for supplying health care services during cost years ending December 31, 1969, through 1972, under Part A of the Medicare Program (Hospital Insurance Ben-

efits for the Aged and Disabled, 42 U.S.C. §§ 1395c—1395i–2 (1976, Supp. IV 1980)). Plaintiffs' case was transferred to this court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982 (28 U.S.C.A. § 171 note (1983)).

The complaint listed 13 plaintiffs, Humana, Inc. (Humana) a holding company, and 12 provider hospitals which operate general acute care facilities in the State of California. Provider hospitals are entitled to receive reimbursement for the "reasonable costs" of hospital services provided to Medicare beneficiaries,[1] and this case involves challenges to decisions of the Secretary (then Department of Health, Education and Welfare, now Department of Health and Human Services) that denied reimbursement for costs attributable to long-term assets and capital, including return on equity, depreciation, and interest allowances, on the ground that certain purchase transactions were stock rather than asset acquisitions.[2] The complaint also challenges the denial of reimbursement to the National group plaintiffs[3] based on inclusion of goodwill in equity capital, on the ground that Medicare regulations preclude reimbursement of purchased goodwill for facilities acquired after August 1, 1970, and the refusal to permit the National group plaintiffs to depreciate acquired assets on an accelerated basis on the ground that the plaintiffs were not "participating providers" on or before February 5, 1970.

Defendant has filed a motion to dismiss and the parties have filed cross-motions for summary judgment. For the reasons that follow, plaintiffs' motion for summary judgment is allowed in part; defendant's motion to dismiss is denied, and its cross-motion for summary judgment is denied in part.

The Medicare Act does not provide a formal administrative review of provider reimbursement claims arising on or prior to June 30, 1973, claims such as are involved in this case. The regulations, however, require the "fiscal intermediary" to provide a review hearing where the amount in controversy exceeds $1,000.[4] Disallowances by plaintiffs' fiscal intermediary, Blue Cross of Southern California, were appealed to the Blue Cross Association Medicare Provider Appeals Committee (BCA), and then to the Health Care Financing Administration (HCFA) on behalf of the Secretary. The decision of the HCFA constitutes the Secretary's final administrative action for purposes of judicial review. For claims arising after June 30, 1973, appeals from the determinations of a fiscal intermediary are to the Provider Reimbursement Review Board (PRRB), if the amount in controversy is at least $10,000. Judicial review of decisions of the PRRB is obtained through an appeal to the district court in which the provider is located or in the District Court for the District of Columbia.[5]

Plaintiffs' reimbursement claims arising after June 30, 1973, that are identical to the pre-1973 claims before the court in this case have been resolved through the PRRB determination and review procedures. In those proceedings, plaintiffs' contentions that the integrated merger transactions constituted asset acquisitions were upheld. With respect to the National group plain-

---

1. 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A) (1976).

2. The "stock acquisition" plaintiffs are: Washington Hospital, West Park Hospital, Imperial Hospital, Indio Community Hospital, Sherman Oaks Community Hospital, Westminster Community Hospital and Doctors Hospital of San Leandro.

3. The "National group" plaintiffs are: Beverly Glen Hospital, Fox Hills Community Hospital, Garden Park General Hospital, San Gabriel Valley Hospital and Stanton Community Hospital.

4. 42 C.F.R. § 405.1809. Until 1976, Medicare reimbursement regulations were codified in Volume 20 of the Code of Federal Regulations. The regulations have been recodified and now are located in Volume 42 of the Code of Federal Regulations. Unless otherwise indicated, citations will be to Volume 42 of the 1978 edition of the C.F.R., which contains the regulations substantially as written at the time of the events in issue.

5. 42 U.S.C. § 1395oo (1976 and Supp. IV 1980); 42 C.F.R. §§ 405.1835 et seq.

tiffs, plaintiffs' contention that the acquisition occurred prior to the August 1, 1970, cutoff date, and the goodwill from the transactions was eligible for inclusion in equity capital, was upheld. Plaintiffs' contention that the acquired assets were subject to accelerated depreciation was denied.[6]

Disposition of this case has been delayed by litigation in other cases that involved the issue of whether a takeover of a provider through 100 percent stock purchase and subsequent merger was equivalent to the purchase of the assets of that provider for purposes of calculating Medicare cost reimbursement,[7] and complicated by reexamination by the Court of Claims of its jurisdiction to review agency decisions under Part A of the Medicare program. As a result, briefing in this case included seven filings that extended from September 11, 1981, to September 22, 1982. On May 5, 1982, after cross-motions for summary judgment and responses thereto had been filed, defendant asserted plaintiffs' complaint should be dismissed. Defendant's assertion was based on the decision of the United States Supreme Court in *United States v. Erika, Inc.*[8] which held that the Court of Claims lacked jurisdiction to review reasonable cost determinations under Part B of the Medicare program. Defendant challenged the subject matter jurisdiction of the Court of Claims, and argued that *Erika* impliedly overruled *Whitecliff,*[9] a case in which the Court of Claims had determined its jurisdiction included the power to review agency

decisions under Part A of the Medicare program. In decisions on September 8 and 22, 1982, the Court of Claims determined that its jurisdiction over Part A Medicare cases was not affected by the decision in *Erika.*[10]

The acquisition transactions involved in this case were made by American Medicorp, Inc. (AMI), a proprietary corporation incorporated in Delaware on January 26, 1968. AMI was engaged in the business of operating general acute care community hospitals, and each of the 12 plaintiff provider hospitals was a wholly owned subsidiary of AMI during the cost years involved.

Humana, the 13th plaintiff, is AMI's successor-in-interest by virtue of its acquisition of AMI in 1978. Humana does not have an agreement with the Secretary to provide Medicare services. Accordingly, it is not eligible to receive Medicare reimbursement payments and its claim for such payments cannot be recognized.[11] Humana will be dismissed as a party in this case.

### FACTS

The essential facts are not in dispute. Each of plaintiff providers owns or leases a hospital. Each is a separate corporation with its own board of directors, maintains its own books, and has executed a Medicare provider agreement with the Secretary.

*Stock Acquisition Plaintiffs*

On February 17, 1969, AMI acquired 100 percent of the capital stock of Imperico, a

**6.** *American Medicorp, Inc. v. Schweiker,* 690 F.2d 750 (9th Cir.1982); *amended on reh'g,* 714 F.2d 68 (9th Cir.1983). The administrative record of the PRRB, and the Secretary's decision thereon, were considered by the BCA and the HCFA, and were incorporated in the record of proceedings relative to plaintiffs' pre-1973 claims.

**7.** *West Seattle Gen. Hosp., Inc. v. United States,* 674 F.2d 899 (Ct.Cl.1982); *Pacific Coast Medical Enter. v. Harris,* 633 F.2d 123 (9th Cir.1980).

**8.** 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982).

**9.** *Whitecliff, Inc. v. United States,* 536 F.2d 347 (Ct.Cl.1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

**10.** *Spokane Valley Gen. Hosp., Inc. v. United States,* 688 F.2d 771 (Ct.Cl.1982); *Rio Hondo Memorial Hosp. v. United States,* 689 F.2d 1025 (Ct.Cl.1982). The panel of the court observed in *Spokane Valley* that the Government had not requested a rehearing en banc to reconsider the jurisdictional issue in the light of *Erika* and stated: "The full court, however, has decided that in view of the significant differences between the statutory provisions dealing with Parts A and B of Medicare, it will not reconsider its decisions that it has jurisdiction over Part A cases." 688 F.2d at 775–76.

**11.** *See Monterey Life Sys., Inc. v. United States,* 635 F.2d 821, 826 (Ct.Cl.1980).

California corporation which was incorporated on August 1, 1968. Imperico had agreed to purchase the capital stock or assets of four of the plaintiffs: Washington Hospital Corporation, West Park Hospital, Imperial Hospital Corporation, and Indio Community Hospital (hereinafter the "Imperico Group"). After acquiring the stock of Imperico, AMI, through wholly owned subsidiaries, exercised those contractual rights and acquired 100 percent of the stock of these four hospitals, and immediately merged the acquired corporations into the AMI subsidiaries. The assets of the four hospitals were revalued on the hospital books to reflect, on a proportional basis, the price paid by AMI for those four hospitals, including an allocated portion of the cost of purchasing the right to acquire those hospitals through the acquisition of the capital stock of Imperico.

AMI, through wholly owned subsidiaries, acquired 100 percent of the capital stock of the corporate owners of Sherman Oaks Community Hospital on November 8, 1968, Westminster Community Hospital on November 21, 1969, and Doctors Hospital of San Leandro on December 22, 1969. Shortly after the stock acquisition, the acquired corporations were merged with the AMI subsidiaries.

Doctor's Hospital was owned and operated by Doctor's Hospital of San Leandro, Inc. (Doctor's, Inc.), until Doctor's, Inc. merged with Estudillo Properties, Inc. (Estudillo), which owned the land and hospital building. On the same day, Estudillo merged with a subsidiary of AMI. In order to avoid a mortgage acceleration, the merger was arranged so that Estudillo survived and the AMI subsidiary was liquidated. The effect of the merger was to make Estudillo a wholly owned subsidiary of AMI.

Each of the stock acquisition plaintiffs acquired its hospital facility and related assets as a result of bona fide, arms-length bargaining with sellers who were unrelated to plaintiffs. The purchase price paid by each plaintiff for such facilities and related assets did not exceed the current fair market value of the individual facilities acquired. The excess of the purchase price over the value of tangible assets acquired plus the book value of the intangible assets was recorded on the books of each stock acquisition plaintiff as goodwill.

Immediately after the acquisitions, each of the plaintiffs exercised complete control over the assets acquired, and made extensive operating and management changes. These changes included changes in staffing criteria, introduction of professional managers separate and apart from the medical staffs, and centralization of accounting, legal and other administrative services.

Plaintiffs submitted annual cost reports for the cost reporting years ending December 31, 1969, 1970, 1971 and 1972 to Blue Cross of Southern California, the fiscal intermediary. The intermediary disallowed the revaluation of assets for depreciation purposes and the inclusion of the increased tangible asset valuations and goodwill in the plaintiffs' return on equity computations on the ground that the stock acquisitions did not represent changes of ownership.

*National Group Plaintiffs*

Beverly Glen Hospital, Fox Hills Community Hospital, Garden Park General Hospital, San Gabriel Valley Hospital and Stanton Community Hospital ("National group") were owned and operated prior to December 29, 1969, by National Hospital Corporation ("National Hospital"). On December 29, 1969, National Hospital executed a binding agreement to sell these five hospitals to AMI. Closing was delayed by difficulties on completing formal requisites for transfer of title. The agreement was closed on March 31, 1971, at which time legal title to the assets of each of the National group facilities vested in AMI. In accordance with the terms of a management agreement dated January 1, 1970, AMI entered into possession of the National group facilities and exercised complete control over the management and operations of such facilities. *De facto* ownership of the National group hospitals was transferred to AMI by the management agreement from January 1, 1970, to the closing date, to the extent

that if the hospitals made money, plaintiffs received that profit, and if the hospitals lost money, plaintiffs were liable for that loss.

The National group plaintiffs sought Medicare reimbursement for the goodwill purchased in the acquisition of their facilities and for depreciation expense calculated on an accelerated basis. The fiscal intermediary denied reimbursement for the goodwill on the ground that the facilities had been purchased after August 1, 1970—the cutoff date for the inclusion of goodwill in equity capital computations in 42 C.F.R. § 405.429(b)(2). Reimbursement for depreciation expense calculated on an accelerated basis was disallowed on the ground that the hospitals were not participating providers under a binding contract before February 5, 1970—the cutoff date for the use of accelerated depreciation in 42 C.F.R. § 405.-415(a)(3)(ii)(d).

On March 16, 1979, and August 21, 1979, HCFA Hearing officers affirmed the BCA decisions with respect to plaintiffs' reimbursement claims for cost years 1969 through 1972.

## DISPOSITION

■ The principal issue raised by the claims of the stock acquisition plaintiffs is whether, under the Medicare statutes, the Secretary may interpret the Medicare regulations so as to deny the take over of a provider by a 100 percent stock purchase and subsequent merger, for the purpose of calculating cost reimbursement, the same treatment that would be given to a direct purchase of the assets of that provider. It is not disputed that, had plaintiffs purchased the assets of the provider corpora-

tions directly, rather than through a two-step acquisition, they would have been allowed cost reimbursements based on an arm's-length purchase price of the assets.

■ Defendant's contentions in support of the Secretary's interpretation were considered by the Court of Claims in *West Seattle.*[12] The court there held that the Secretary's refusal to treat a two-step acquisition as a purchase of assets was a violation of the governing statutes and overturned the Secretary's determination. The court viewed the stock purchase and merger as an integrated transaction, and agreed with the Ninth Circuit's conclusion that the Secretary's characterization was not consistent with common understanding of such transactions in financial fields.[13] Inasmuch as the Secretary's actions "take no count of the transactions as they actually took place," the court found, they frustrated the statutory requirement that reimbursement is due on "actual costs."[14] This court accepts as binding precedent all published decisions of the Court of Claims "unless and until modified by decisions of the United States Court of Appeals for the Federal Circuit or the United States Supreme Court."[15]

■ Defendant concedes that five of the plaintiffs advance claims on the stock acquisition issue that are deemed to be essentially identical to the *West Seattle* plaintiffs.[16] Defendant, however, contends this case should be remanded to the Secretary because the transactions give rise to questions about the amounts of goodwill which AMI assigned to plaintiffs. Remand is unnecessary. The decisions of both the BCA and the HCFA were based on facts determined

---

12. *West Seattle Gen. Hosp., Inc. v. United States,* 674 F.2d 899.

13. 674 F.2d at 904; citing with approval: *Pacific Coast Medical Enter. v. Harris,* 633 F.2d 123, 132.

14. 674 F.2d at 904.

15. General Order No. 1, 1 Cl.Ct. xxi. Defendant points out that the reasoning in *West Seattle* was questioned in *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 134 (D.C.Cir.1982), and rejected in *Humana Inc. v. Schweiker,* Nos.

75–0302, 78–0175, 78–0584, 81–0853 and 81–1311 (D.D.C. Aug. 19, 1982) (memorandum and order), involving a 100 percent stock purchase, followed by merger and liquidation of the acquired corporation. This court, of course, follows the precedent of *West Seattle.*

16. Washington Hospital Corporation; West Park Hospital; Indio Community Hospital; Imperico d/b/a Imperial Hospital; and Westminster Hospital, Inc.

by the PRRB on plaintiffs' post-1973 reimbursement claims. In its March 22, 1977, decision, the PRRB determined: "The consideration paid by the American Medicorp, Inc. was negotiated at arm's-length and reflected the market value of the assets comprising the hospitals." This finding of fact was not overruled by the Secretary. When the stock purchase price is negotiated at arm's-length, it is by definition reasonable, and therefore wholly reimburseable under the Medicare Act.

Defendant argues that plaintiff Sherman Oaks Community Hospital is not entitled to a return on goodwill. In that transaction, plaintiff acquired a long-term lease of hospital facilities rather than a fee; the stock acquisition agreement required that the lease be executed. Defendant contends goodwill may be recognized only when it is acquired in connection with the acquisition of tangible assets.

In *Spokane Valley,* the Court of Claims observed, citing to generally accepted accounting principles, that for purposes of entitlement to a return on goodwill "it is immaterial that the acquisition took the form of a long-term lease rather than a transfer of assets." [17] The *Spokane Valley* decision governs the claim of plaintiff Sherman Oaks Community Hospital that it is entitled to include goodwill in its equity capital.

Defendant would deny the reimbursement claims of plaintiff Doctor's Hospital of San Leandro on the ground that the transactions did not involve a change in the ownership of the assets. Defendant points out that at all relevant times, Estudillo Properties, Inc. owned the land and hospital building. Estudillo was acquired by a subsidiary of AMI, and the subsidiary was then merged into the acquired corporation, which made Estudillo a wholly owned subsidiary of AMI. The distinction defendant draws is

too refined; defendant ignores the substance of these transactions. In substance, and as intended by the parties, the end result is the same as in *West Seattle*—the two corporate entities involved (AMI's subsidiary and Estudillo) merged, and the assets remained in the surviving corporation.[18] Defendant cites the holding in *Monterey Life Systems, Inc. v. United States,*[19] that tangible assets of a provider may not be revalued simply upon the sale of 100 percent of its capital stock to a different stockholder. That case, however, did not involve a subsequent merger or liquidation. There was no integrated transaction, which is crucial.

The claims of the National group plaintiffs involve amendments to the regulations, effective on August 1, 1970, concerning recognition of goodwill, and on February 5, 1970, concerning entitlement to accelerated depreciation. On December 29, 1969, National Hospital Corporation executed a binding agreement to sell the National group hospitals to AMI. Pursuant to a management agreement dated January 1, 1970, AMI immediately entered into possession of the hospitals. Its control over their management, personnel and operations was so complete that AMI received pre-tax profits, was at risk for any losses, and treated the hospitals as owned facilities on its profit and loss statements. Closing and transfer of legal title, however, was delayed until March 31, 1971. In the interim, the Secretary on February 5, 1970, published proposed revisions to the relevant regulations.[20] The issue, therefore, is the status under the applicable regulations of the National group plaintiffs on February 5 and August 1, 1970.

The revised regulations provided that goodwill could not be included in equity capital with respect to a facility acquired on or after August 1, 1970.[21] Defendant con-

---

**17.** 688 F.2d at 779. Defendant conceded that the issue in *Spokane Valley* was identical and incorporated its brief in that case as its opposition in regard to Sherman Oaks.

**18.** *See also American Medicorp, Inc.* fn. 6.

**19.** 635 F.2d 821 (1980).

**20.** 35 Fed.Reg. 2593 (1970).

**21.** 42 C.F.R. § 405.429(b)(2) states:
"With respect to a facility or any tangible assets of a facility acquired on or after August 1,

tends the hospitals were not "acquired" until the purchase was completed by the exchange of legal title when the sale was consummated on March 31, 1971. Plaintiffs contend that AMI acquired the National group on January 1, 1970, when the management agreement went into effect. Plaintiffs cite case law that recognizes the status of a purchaser in an acquisition during the period when possession and control is exercised prior to transfer of legal title.[22]

The Ninth Circuit, with respect to plaintiffs' reimbursement claims for post-1973 years on this issue, held that AMI acquired the National group on January 1, 1970, when the management agreement became effective.[23]

■ It is commonly understood that a contract to purchase vests in the purchaser at least equitable title to the asset purchased. The National group had been "acquired" to this extent when the management agreement became effective. Defendant's arguments are not persuasive, and there is no reason for this court to decide this issue contrary to the decision of the Ninth Circuit. Accordingly, it is held that the National group hospitals, within the meaning of the regulation, were ac-

quired before August 1, 1970. Plaintiffs are entitled to include purchased goodwill in their equity capital for Medicare reimbursement purposes.

■ The relevant provisions of the revised regulations applicable to accelerated depreciation provided that acceleration is available to a provider who was "participating in the program" on or before February 5, 1970.[24] Defendant argues that subsection (d) of the regulation requires: (1) that the participating provider be in the program before February 5, 1970, and (2) that the provider had entered into a valid written contract which was binding on it on February 5, 1970. While AMI meets the second requirement by virtue of the December 29, 1969, purchase agreement, it does not satisfy the first requirement because AMI itself was not a participating provider. The National group did not have their provider agreements recertified by the Secretary until after the March 31, 1971, closing and transfer of legal ownership.

Plaintiffs contend that realistically the National group's facilities were acquired prior to August 1, 1970, and that such status should apply to the "participating provider" requirement. Plaintiffs further ar-

1970, the excess of the price paid for such facility or such tangible assets over the historical cost, as defined in § 405.415(b), or the cost basis, as determined under § 405.415(g) (whichever is appropriate), is not includable in equity capital. . . ."

42 C.F.R. § 405.429(b)(3) states:

"With respect to a facility or any tangible assets of a facility acquired before August 1970, the excess of the price paid for such facility or assets over the fair market value of tangible assets at the time of the purchase is includable in equity capital to the extent. . . ."

**22.** *Huddelston v. United States,* 415 U.S. 814, 820, 94 S.Ct. 1262, 1266, 39 L.Ed.2d 782 (1974) ("acquire" defined as possession or control); *Lykes Bros. S.S. Co. v. United States,* 513 F.2d 1342, 1354 (Ct.Cl.1975) (taxpayer acquired property when it was reduced to physical possession or control).

**23.** *American Medicorp, Inc. v. Schweiker,* 690 F.2d 750, 753 (9th Cir.1982); *amended on reh'g,* 714 F.2d 68 (9th Cir.1983).

**24.** 42 C.F.R. §§ 405.415(a)(3)(ii)(a), (b), (c) and (d) (1978) provide:

"(a) Depreciable assets for which accelerated depreciation was used for health insurance purposes, before [August 1, 1970], including those assets for which a timely request to change from straight line depreciation to accelerated depreciation was received by an intermediary before [August 1, 1970];

"(b) Depreciable assets acquired before [August 1, 1970] where no election to use straight-line or accelerated depreciation was in effect on such date and the provider was participating in the program on such date;

"(c) Depreciable assets of a provider where construction of such depreciable asset began before February 5, 1970, and the provider was participating in the program on February 5, 1970; or

"(d) Depreciable assets of a provider where a valid written contract was entered into by a provider participating in the program before February 5, 1970, for construction, acquisition, or for the permanent financing thereof and such contract was binding on a provider on February 5, 1970, and at all times thereafter. . . ."

gue that, in view of the December 29, 1969, commitment, application of the revised regulation to their situation would be unfair and inappropriate.

None of plaintiffs' arguments are persuasive. Although AMI had acquired a provider by February 5, 1970, AMI itself was not a participating provider. A participating provider is the legal entity which files a provider agreement with the Secretary. A provider may file such an agreement to participate in the Medicare program as a successor owner of a hospital facility upon the facility's recertification as meeting the conditions of participation.[25] AMI's subsidiaries could not become participating providers until ownership of the hospital facilities was transferred to them, as it was on March 31, 1971.

The proposed regulation was published February 5, 1970, with notice that it would be effective August 1, 1970. Plaintiffs were not foreclosed from closing the purchase before that date. That the regulation may have affected the parties' expectations does not make it invalid. The refusal to allow accelerated depreciation does not deny plaintiffs, or any other providers, reimbursement for their actual costs. Defendant's motion will be allowed in part with respect to the National group's entitlement to reimbursement based on accelerated depreciation.

## CONCLUSION

Defendant's motion to dismiss is denied. Plaintiffs' motion for summary judgment is allowed as to the stock purchase issue and as to the National group's entitlement to include goodwill in their equity capital, and is otherwise denied. Defendant's motion for summary judgment is allowed as to the National group's entitlement to accelerated depreciation, and is otherwise denied. Counsel shall report in 30 days the result of efforts to stipulate the amounts due plaintiffs. The report shall recommend further proceedings, if any, that may be required for entry of judgment in this case.

**25.** 42 C.F.R. § 405.625(a) (1978).